```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA


   * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,           )  Criminal Action
                                    )  No. 18-253
vs.                                 )
                                    )
MANUEL D. REYNOSO,                  )  2:59 p.m.
              Defendant.            )  November 16, 2018
                                    )  Washington, D.C.
                                    )
   * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF HEARING ON MOTION TO SUPPRESS**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**APPEARANCES:**


FOR THE GOVERNMENT: KARLA-DEE CLARK
                    U.S. Attorney's Office for the
                    District of Columbia
                    555 4th Street NW
                    Washington, D.C., 20001-2733
                    (202)252-7740
                    Email: Karla-Dee.Clark@usdoj.gov


FOR THE DEFENDANT:  BRIAN K. McDANIEL
                    1920 L Street NW
                    Suite 303
                    Washington, D.C., 20036
                    (202)875-8361
                    Email: Bkmassociates@aol.com



Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
                    Washington, D.C.  20001


         Proceedings reported by machine shorthand, transcript
              produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2              THE DEPUTY:  The Court calls the parties in the

3     matter of United States of America versus Manuel D. Reynoso.

4              Matter before the Court:  Criminal Case

5     No. 18-253, United States of America versus Manuel D.

6     Reynoso.

7              Counsel, please come forward and identify

8     yourselves for the record.

9              MS. CLARK:  Good afternoon, Your Honor.

10    Karla-Dee Clark on behalf of the United States.

11             May I have one brief second to set up while

12    Mr. McDaniel introduces himself?

13             THE COURT:  Yes, of course.

14             MR. McDANIEL:  Good afternoon, Your Honor.

15             May it please the Court, Brian McDaniel on behalf

16    of Mr. Reynoso.  Mr. Reynoso is present, seated at counsel

17    table.

18             THE COURT:  Good afternoon, Mr. McDaniel.

19             Good afternoon, Mr. Reynoso.

20             I'd like to begin, before we proceed right to the

21    evidentiary hearing, with what I typically do at the

22    pretrial conference, which is the *Missouri v Frye* colloquy

23    where I have the Government explain what plea offers have

24    been extended in the case and what the penalties are that

25    Mr. Reynoso is facing.

1              But given the back and forth about whether

2      Mr. Reynoso is going to take a plea, not take a plea, I

3      think it's appropriate to review the penalties that

4      Mr. Reynoso is facing, should he be convicted of the crimes

5      charged, and what the plea offer was at least in the case.

6              So, Ms. Clark, when you are ready for that, I will

7      hear from you.  But take your time, I know you're setting

8      up.

9              MS. CLARK:  If I can start, Your Honor, just to

10     put on the record, the Indictment charges the defendant, in

11     Count 1, with one count of unlawful possession of a firearm

12     and ammunition by a person convicted of a crime punishable

13     by imprisonment for a term exceeding one year.  That's in

14     violation of 18 United States Code, Section 922(g)(1).

15             In Count 2, the defendant is charged with simple

16     possession of a controlled substance in violation of

17     Title 21 United States Code, Section 844(a).

18             And that is the same count for Count 3, simple

19     possession of a controlled substance, in violation of that

20     same statute.

21             The plea offer that the Government extended

22     actually was a global --

23             THE COURT:  And so if convicted of both those?

24             MS. CLARK:  Your Honor, I can let the Court know

25     that -- Court's indulgence briefly.

1              If I could start with the 922(g) charge, the

2     felony possession charge, the statutory penalties will be a

3     fine and imprisoned for not more than ten years, or both;

4     and the fine would be not more than $250,000.  And that's

5     the statutory provision for that.

6              The statutory penalties for simple possession --

7     in this case, I am going to set forth three for the Court

8     for the following reasons:  The defendant would be subject

9     to enhancement papers, under Section 851, under the simple

10    possession statute.  There are actually three different

11    penalties set forth under 844(a), and they are as follows:

12             For just --

13             THE COURT:  Have you filed enhancement papers in

14    this case?

15             MS. CLARK:  We have not filed enhancements yet;

16    but the law provides we could file them prior to trial -- to

17    the trial date.  And depending on the outcome of this

18    motions hearing, the Government would then intend -- we

19    didn't file them prior to this, quite frankly, because we

20    were in plea negotiations, back and forth, for a while.  So

21    it was easier for the Government not to file those papers

22    and then have to move to withdraw the papers as part of the

23    plea.

24             For one provision, under 844(a), the first one --

25    not contingent upon any prior convictions or enhancement,

1    the sentence is to a term of imprisonment of not more than

2    one year, and shall be a fine -- shall be fined a minimum of

3    a $1,000, or both.

4         If a defendant has one prior conviction for any

5    drug or narcotic offense -- and it does not specify what

6    type, in terms of felony or misdemeanor -- it's a mandatory

7    minimum of 15 days but not more than two years, and a

8    fine -- minimum amount of $2,500.  And then there is a third

9    provision, if there are two or more prior convictions for

10   drug or narcotic offenses, not less than 90 days -- so that

11   would be a 90-day mandatory minimum, but not more than three

12   years, and a fine in the minimum of $5,000.

13        THE COURT:  And how many priors does Mr. Reynoso

14   have?

15        MS. CLARK:  Mr. Reynoso has four prior

16   convictions -- actually, three.

17        Let me correct that, he has three prior

18   convictions:  Possession with intent to distribute and the

19   distribution of marijuana, coming out of Virginia in 2011;

20   possession of a controlled substance and DUI, coming out of

21   Maryland in 2010; and, then, a 2006 possession of marijuana

22   out of Houston, Texas.  And he is currently pending

23   sentencing in a case in the Circuit Court of Maryland.

24        So if the Government calculated this correctly, we

25   calculate him at, approximately, six criminal history

1    points, and a Criminal History Category of III.  The reason

2    why we did that -- although he's pending sentencing in the

3    case in Maryland -- notwithstanding that's not a conviction,

4    it still scored two points according to the guidelines.

5           So what I was able to do, Your Honor, is -- under

6    just the gun, the firearms charge, his base offense level

7    would be 22 under 2K2.1(a)(3).  And that's because there is

8    a firearm that had a high-capacity magazine, and he has a

9    prior felony drug offense.  If he went to trial, that would

10   be his base offense level.  We did not take off points for

11   acceptance, although that's optional following trial.

12          So with a base offense level of 22 and Criminal

13   History Category III, his guideline estimated range is 51

14   months to 63 months.

15          What I have not had the opportunity to do, which I

16   think may involve, potentially, grouping, would be to group

17   both the firearms and the simple -- ES2 [sic] simple

18   possession counts.  So I apologize to the Court, I don't

19   have those guidelines for both of those offenses.  But I

20   really think it would be the firearms charge that's sort of

21   driving the train here in this case.

22          The plea offer that the Government --

23          THE COURT:  And, then, in Maryland -- because, as

24   I understood, the plea offer was going to be a global one

25   with Maryland --

1              MS. CLARK:  It was global to the extent that our

2      offer --

3              THE COURT:  Are you going to ask for concurrent

4      terms?

5              MS. CLARK:  The State's attorney's office in

6      Maryland had agreed that they would -- they would ask, in

7      their sentencing, for a concurrent term.  So I style it

8      "global" in that sense.  But the U.S. Attorney's Office was

9      not bound by that, but they agreed to be bound by our

10     agreement -- our plea agreement with the defendant in that

11     respect.

12             So, on October 12th of 2018, the Government

13     extended, in this case, a plea offer to Count 1 of the

14     Indictment, which is the 922(g) charge.  We agreed to

15     dismiss Counts 2 and 3 at the sentencing hearing.

16             We would agree, if all went according to plan,

17     that he would get three levels off for acceptance of

18     responsibility.  He's, of course, entitled to ask for a

19     variance under the 3553(a) factors --

20             THE COURT:  Which would bring him to a Level 19.

21             MS. CLARK:  Level 19, with an estimate guideline

22     range of 37 months to 46 months.  As part of that plea

23     agreement, the Government agreed to restrict its allocution

24     to the low end of the guidelines.  And, of course, the

25     defense was free to ask for whatever sentence they would

1    deem appropriate that they would ask for.

2              And as I said, I think a very important part of

3    that -- because, ultimately, my understanding -- after

4    reviewing the paperwork and speaking to the prosecutor in

5    Maryland, they agreed to a one-year period that they would

6    ask for in Maryland, notwithstanding he was facing ten years

7    out there; but, then, they also agreed to ask for that

8    sentence to be concurrent to this sentence.  So if that all

9    came to fruition, then his guideline range, pursuant to a

10   plea, would be far different than if -- has the possibility

11   of being far different than conviction following a trial.

12             THE COURT:  All right.  And that was communicated

13   to Mr. Reynoso's counsel on October 12th?

14             MS. CLARK:  Yes, ma'am.

15             THE COURT:  All right.

16             MS. CLARK:  And then we've had -- as the Court is

17   aware, since that time, we've had -- been in ongoing plea

18   discussions because there was an initial, sort of, rejection

19   of that, then we started talking again.  So -- but that has

20   been the plea offer that -- those terms have not been

21   modified.

22             THE COURT:  Okay.  And when does this plea offer

23   expire?

24             MS. CLARK:  Well, the plea offer was rejected by

25   the defendant at our last status hearing that we held.  So

1    we deem that he rejected it, not that we withdrew it or that

2    it terminated in that respect.

3              THE COURT:  I understand.  Okay.  Thank you.

4              And, Mr. McDaniel, you communicated the

5    October 12th plea offer to Mr. Reynoso?

6              MR. McDANIEL:  Yes, Your Honor.

7              Ms. Clark's recitation of the procedural posture

8    related to the plea agreement and the negotiations

9    surrounding the same is accurate.  As the Court knows, there

10   was an initial representation that Mr. Reynoso was going to

11   accept the plea agreement.

12             We came here to the hearing; and this Court

13   instructed Mr. Reynoso that if, in fact, he was to change

14   his mind regarding that, that he should then inform his

15   counsel.  Indeed, on that very day, maybe hours after we

16   left here, he called my office and said that he had

17   rethought that, and that he wished to go to trial.

18             And so the information related to the plea has

19   been extended to him.  He has been advised of the same.  He

20   has now been advised again here in court.  He understands

21   the offer that's been extended; and he has represented to

22   his counsel that he wishes to go to forward and go to trial.

23             THE COURT:  All right.

24             Mr. Reynoso, is that correct?

25             THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Okay.

2          All right.  So we're here on both the Government's

3    motion to introduce 404(b) evidence and the defense motion

4    to suppress evidence that led to the instant charges.

5          I'm going to start with the Government's motion on

6    404(b) evidence, and then I'll proceed to the evidentiary

7    hearing.

8          So, Ms. Clark, it's your motion.  Is there

9    anything that you want to add to your papers?

10         MS. CLARK:  There is one correction that I would

11   like to add to the Government's motion.

12         At the time that we filed our motion, we were in

13   the process of obtaining the transcript from his plea

14   hearing in Maryland.  After that, we did obtain the

15   transcript; and we provided that to Mr. McDaniel.

16         When I talked to the prosecutor, it was relayed to

17   me that the defendant was under oath at the time that that

18   plea colloquy occurred.  When I received the transcript and

19   read it, I could not find in the transcript where the

20   defendant was placed under oath.

21         So we're now going to go back and see -- it may

22   have been a situation where this was more of a group setting

23   or other people were placed under oath.  But I can just tell

24   the Court, based on the transcript I've read, I do not see

25   an entry that the defendant was placed under oath prior to

1    the plea colloquy.  So I just want to report that and make

2    that correction to the Court.

3         And, ultimately, that, I think, would affect the

4    Government's presentation of the evidence.  If the Court

5    were to grant the Government's 404(b) motion, our original

6    intention was to use the transcript and redact it and to

7    keep it as narrow as possible.

8         Now seeing that that transcript was not under

9    oath -- should the Court grant the Government's motion, I

10   think the Government has a couple of options.  One would be

11   we would actually put on just, you know, the officer that's

12   needed to establish this.  But, also, when I read the

13   transcript, the defendant was represented by counsel.  It

14   has all the indicia of reliability, in terms of the

15   defendant knew the proceedings, knew what was going on --

16   although, expressly, he was not placed under oath.

17        And it is an admission by a party opponent that

18   the defendant's statements were to a judicial officer.  So

19   if there is a contention of the fact that the defendant's

20   plea colloquy was not under oath, arguably -- if the defense

21   says that the transcript cannot be used, should the Court

22   grant the Government's motion, because they dispute that it

23   wasn't under oath, then these are the alternatives we are

24   now going to pursue to -- for -- in terms of what type of

25   evidence.

1          THE COURT:  Have you conferred with Mr. McDaniel

2    about if your -- if the Government's motion is granted

3    whether he objects to use of the transcript?

4          MS. CLARK:  I have not yet done that, Your Honor.

5          THE COURT:  All right.

6          MS. CLARK:  I was going to wait to see what the

7    Court's ruling was going --

8          THE COURT:  I see.  Okay.

9          MS. CLARK:  -- to be on that.  And then, after

10   that, see if -- if maybe even for a stipulation or, you

11   know, limited for use of the transcript.  But that's --

12         THE COURT:  And if I admit the evidence, you would

13   certainly propose providing a limiting instruction?

14         MS. CLARK:  Absolutely.

15         Actually, we think that that would be -- we would

16   ask -- we almost deem it would be required to eliminate into

17   any potential prejudice and to satisfy the Rule 403 prong.

18         But as we set -- we set forth the facts of the

19   offense in Maryland in our motion.  And I think what's

20   important that we highlight are the reasons that the

21   Government would like to use this, which we actually set

22   forth.  So I am not going to go through that, I know the

23   Court's read all of our pleadings -- but for knowledge and

24   plan and for motive are the reasons.

25         And, importantly, inherent in any 404(b) evidence,

1    it's going to be prejudice -- it's going to be prejudicial

2    to the defense.  And that, standing alone, is insufficient,

3    as we know from the Circuit case law, to say that 404(b)

4    evidence shouldn't not be used [sic] or should never be used

5    or should not be used in this instance.

6         And we would submit to the Court that the

7    balancing of the 404(3) test, which we deem to be probably

8    the most important argument for this particular -- for the

9    Government's motion, should tilt in favor of the Government.

10        We plan to make limited use of this; we don't plan

11   to highlight this.  We would overhighlight it.  And we would

12   absolutely request and prepare for the Court a limiting

13   instruction.  And we would submit to the Court that that

14   limiting instruction could be read after the Government

15   introduces its 404(b) evidence, should the Court grant the

16   motion, and also, again, in the closing instructions to the

17   jury which, in our opinion, would act as sort of a double

18   barrier.

19        And court juries are -- I think it's the *Zafiro*

20   case, United States Supreme Court case, juries are presumed

21   to follow the Court's instructions.  So this is relevant

22   evidence; it goes to his knowledge, the motive, plan.  And

23   the way that this was done, as we set forth in our motion --

24   and sort of a unique argument, in terms of how the motive

25   ties into the intent with the offense on March 28th of 2017

1    with the instant offense in this case, on May 16th, cleverly

2    placing the gun within arm's reach by having it not on your

3    person, knowing that he couldn't possess a firearm at that

4    time, would further our argument that he knew what he was

5    doing -- and, also, for the marijuana.  Knows knowledge of

6    marijuana, knows the smell of marijuana -- actually knew

7    enough to maybe say to the officer:  I have marijuana,

8    hoping that would deflect the officer; the officer may walk

9    away, knowing there is something more serious, in terms of

10   contraband, in the vehicle with the defendant at that time.

11         So we believe that, on balance, the Court should

12   grant the Government's motion.  And there are enough

13   procedural safeguards in terms of the limiting instruction.

14   And we will be very, very careful in the manner in which we

15   use this because we know the, you know, negative

16   implications of 404(b).

17         But with the limited stated use of why the

18   Government wants to use it, should the Court grant the

19   motion, I will definitely work with Mr. McDaniel, and speak

20   with him, to find the best way that the Government could get

21   this in, in a more minimal way, once I realized in the

22   transcript that he was not under oath.

23         THE COURT:  Okay.  Thank you.

24         Mr. McDaniel.

25         MR. McDANIEL:  Yes, Your Honor.

1          So we filed a motion in opposition to the

2     Government's request to use 404(b) evidence in this case.

3          As I understand it, Your Honor, the Government

4     would be proffering this evidence in order to show the

5     knowledge component.  And I hear, in the argument today,

6     possibly some -- some reference to "motive."  But it seems

7     to me that they would be offering this information to show

8     that Mr. Reynoso knew that, on the day in question in our

9     case, he actually had a firearm in the vehicle.

10          And so just -- moving aside from the question of

11     whether or not there is some permissive category that

12     they're advancing the information in, the gravamen of our

13     argument, Your Honor, is that the -- the allowance of this

14     information, although all 404(b) evidence is intended to be

15     prejudicial -- and I am fully aware of that, as is primarily

16     all of the information that's solicited by the Government at

17     all -- we understand the nature of the beast, so to speak.

18          The question for the Court is whether or not it's

19     more prejudicial than probative under 403.  And I think the

20     Court would be aided in -- in making a determination of kind

21     of looking at it from the back going forward.  So how would

22     a jury potentially misuse the information, if you will?

23          If, in fact, the jury is given information related

24     to a case that came about in Prince George's County earlier

25     in the same year for Mr. Reynoso in the same vehicle under

1    similar circumstances, it is likely, Your Honor, that they

2    would fall into the trap of determining that he likely had a

3    firearm here by virtue of the mere character of

4    the similarities of the facts, so to speak, and that's what

5    is prohibited by 404(b).

6            What we're trying to avoid is the jury making a

7    determination that this is just in this individual's

8    character outside of a common scheme, because we don't know

9    that a common scheme is necessarily applicable to a question

10   of possession of a firearm.  And I think that the likelihood

11   of misuse by the jury is high given the similarities of

12   these two cases.  I would --

13           THE COURT:  Isn't that one of the ironies, though,

14   Mr. McDaniel, that 404(b) evidence that's so similar in kind

15   both lends itself to propensity -- inappropriate propensity

16   findings by the jury, but it also is incredibly probative of

17   knowledge, intent, motive -- all the reasons that the

18   Government has urged granting its motion and that are

19   perfectly acceptable under 404(b)?

20           MR. McDANIEL:  I certainly understand the Court's

21   question.

22           You know, factually, Your Honor, I think it might

23   be important to note that, in the earlier case though, the

24   firearm was found in a different position than the firearm

25   that is at issue in this case.  In other words, they allege

1    that the firearm in the earlier case was found in the center

2    console which, arguably, is easier to access than a firearm

3    which is ostensibly underneath the seat of the driver; but I

4    certainly understand the Court's position.

5            But our position would be that the similarities of

6    those two factual scenarios lends itself to the propensity

7    analysis by the jury and, for that reason, we would ask the

8    Court not allow the evidence.  If the Court does allow the

9    evidence, then I would work closely with Ms. Clark to figure

10   out how best to elicit that information.

11           THE COURT:  Okay.  Thank you.

12           MR. McDANIEL:  Very well.

13           THE COURT:  Any response?  Or you can rest on your

14   papers.

15           MS. CLARK:  No, Your Honor.  We rest on our

16   papers.

17           THE COURT:  All right.  I'm ready to rule.

18           The Government seeks to introduce evidence of the

19   defendant's prior criminal conduct stemming from his arrest

20   on March 28, 2017, which form the basis for criminal charges

21   against him in Prince George's County, Maryland.

22           Based on the Government's proffer, this evidence

23   relates to a single incident occurring a little over a year

24   before the charged incident in this case.

25           Specifically, on March 28th, 2017, shortly before

1    8:00 p.m., a PG County police officer found the defendant

2    sitting in the driver's seat of a blue 2008 BMW, in fact,

3    the same BMW the defendant was driving in the instant case.

4          When the officer approached the BMW, he smelled a

5    strong odor consistent with marijuana and asked the

6    defendant what he was doing.  The defendant allegedly

7    replied he was visiting a friend but unable to provide the

8    friend's location.  He also said he had a little marijuana

9    in the backpack that was in the BMW.

10         The officer asked the defendant to leave the

11    vehicle.  The officer searched the BMW, recovered a backpack

12    containing several items, including about 212 grams of

13    marijuana which field tested positive for THC.  The search

14    also uncovered, from the car's center console, a black

15    Glock 23, .40 caliber Smith & Wesson semi-automatic pistol

16    with eight cartridges, one in the chamber and seven in the

17    magazine.  And when the defendant was searched instant to

18    his arrest, there was approximately $1,647 recovered from

19    his person.  The defendant's already pled guilty to this

20    case -- to possession with intent to distribute marijuana

21    and a firearm possession by a person with a felony

22    conviction, and is awaiting sentencing in Maryland.

23         Under Federal Rule of Evidence 404(b), evidence of

24    a "crime, wrong, or other act, is not admissible to prove a

25    person's character in order to show that on a particular

1    occasion the person acted in accordance with the character";

2    see Federal Rule of Evidence 404(b)(1).  Such evidence,

3    however, may be admissible for another purpose, such as

4    proving motive, opportunity, intent, preparation, plan,

5    knowledge, identity, absence of mistake, or a lack of

6    accident; see 404(b)(2).

7            The D.C. Circuit has pointed out that, although

8    the first sentence of Rule 404(b) is framed restrictively,

9    the rule itself is quite permissive, prohibiting the

10   admission of other evidence -- other crimes evidence in but

11   one circumstance:  For the purpose of proving that a

12   person's actions conformed to his character.  See *U.S. v*

13   *Bowie*, D.C. Circuit case from 2000.

14           In short, as the *Bowie* court case -- Court said:

15   Rule 404(b) is a rule of inclusion rather than exclusion.

16           Likewise, in *Huddleston*, the Supreme -- a Supreme

17   Court case from 1988, the Supreme Court explained that

18   404(b) evidence generally -- that 404(b) generally prohibits

19   the introduction of evidence of extrinsic acts that might

20   adversely reflect on the actor's character, unless that

21   evidence bears upon a relevant issue in the case, such as

22   motive, opportunity, or knowledge.

23           Extrinsic acts evidence may be critical to the

24   establishment of the truth as to a disputed issue,

25   especially when that issue involves the actor's state of

1    mind and the only means of ascertaining that mental state is

2    by drawing inferences from conduct.

3            Even if evidence may be admissible under 404(b),

4    the Court must continue its analysis and consider whether,

5    under Rule 403, the evidence must be excluded on the basis

6    that the evidence is unfairly prejudice, cumulative or the

7    like, its relevance notwithstanding; see *U.S. v Bowie*.

8            So the two-step analysis certification of a proper

9    and relevant purpose, under 404(b), followed by the weighing

10   of the probity of prejudice under Rule 403 is firmly rooted

11   in the law of this Circuit.  See *U.S. v Miller*, a D.C.

12   Circuit case from 1990, and *U.S. v Sitzmann*, a DDC case from

13   2012.

14           In evaluating the admissibility of evidence under

15   Rule 403, the Court is cognizant the rule does not bar

16   powerful or even prejudicial evidence.  Instead, the rule

17   focuses on the danger of unfair prejudice that gives -- and

18   gives the Court discretion to exclude evidence only if that

19   danger substantially outweighs the evidence's probative

20   value.  See *U.S. v Pettiford*, a D.C. Circuit case from 2008.

21           Notably, in cases where a defendant is charged

22   with unlawful possession of something, evidence that he

23   possessed the same or similar things at other times is often

24   quite relevant to his knowledge and intent with regard to

25   the crime charged.  See *U.S. v King*, a D.C. Circuit case

1    from 2001; *Huddleston v U.S.*, Supreme Court case from 1988;

2    see, also, *U.S. v Douglas*, a D.C. Circuit case from 2007.

3            Set against these legal standards, the evidence of

4    the defendant's prior criminal conduct stemming from his

5    arrest in Prince George's County on March 28th, 2017, may be

6    admitted.

7            The Government seeks to admit this prior criminal

8    conduct as relevant as proof of the defendant's knowledge,

9    plan, motive, intent, and/or absence of mistake because the

10   defendant's constructive possession of the Glock 23,

11   .40 caliber semi-automatic pistol and ammunition in the BMW

12   on March 28th, 2017, is probative and relevant to show his

13   knowledge to constructively possess a Glock 27, .40 caliber

14   semi-automatic pistol, ammunition, and magazine in the same

15   BMW on May 16th, 2018, as charged in this case.

16           The defendant objects that the evidence is being

17   offered in an impermissible attempt to prove the defendant

18   is of a bad a character and that it is unfair propensity

19   evidence.  Contrary to the defendant's objection, the

20   Government seeks to use the facts surrounding his

21   March 28th, 2017, offense to establish that he

22   constructively possessed both the firearm and the marijuana

23   later found in his BMW on May 16th, 2018.

24           On both occasions, the defendant was in a position

25   to exercise dominion and control over the firearms.  The

1    first occasion, in Maryland, the firearm was in the center

2    console of the BMW; in the second, the firearm was under the

3    driver's seat floor mat.  The similar placement of the gun

4    in the earlier episode indicates his intent to keep the

5    firearm within arm's reach but not immediately visible.

6         The intent then serves as an intermediate fact

7    from which the jury can infer another intermediate fact:

8    Motive, from which it could, in turn, infer the element of

9    possession.  See *Crowder*, a D.C. Circuit case from 1998.

10        Thus, as the en banc Circuit has recognized in

11   *Crowder*, quote:  Other-offense evidence of intent would have

12   probative value not just on the element of intent but also

13   on the possession element of the offense.

14        Similarly, regarding the marijuana, the D.C.

15   Circuit has held that, in cases where a defendant is charged

16   with unlawful possession of something, evidence he possessed

17   the same or similar things at other times is often quite

18   relevant to his knowledge and intent with regard to the

19   crime charged.  See *Cassell*, a D.C. Circuit case from 2002.

20        The defendant has already pleaded guilty to

21   possession with intent to distribute marijuana after the

22   officers recovered 212 grams of marijuana inside his

23   backpack, and this earlier charge of unlawful possession of

24   marijuana is, thus, relevant to his knowledge and intent

25   with regard to the current crime charged; that is,

1      possession of marijuana, among other things.

2              This evidence may be prejudicial, but the question

3      really is:  Is it unduly prejudicial under Rule 403?  The

4      evidence that the Government seeks to admit in this case is

5      probative of his intent regarding constructive possession of

6      the firearm and the contraband and makes it less likely that

7      the defendant accidentally or mistakenly possessed the

8      firearm.  He has already pleaded guilty to the charges

9      stemming from the March 2017 events, so the probative nature

10     of this evidence is apparent and outweighs any prejudicial

11     potential of the evidence.

12             There is not a lot more drugs in one case versus

13     the other, a lot -- many more guns in one case or the other

14     that would make -- raise some concern about prejudice

15     between the two different incidents, particularly given the

16     similarity in the conduct.

17             Although the defendant argues that it -- because

18     of the similarity this would show his propensity to commit

19     the underlying crime but, rather, the March 2017 incident is

20     materially related to and probative of the defendant's

21     knowledge and constructive possession of the firearm and

22     marijuana on the date charged.

23             So, for these reasons, the Court finds that the

24     evidence of his prior criminal conduct in March 2017, to

25     which he's pleaded guilty in February 2018, is admissible

1    under Federal Rule of Evidence 403 and 404(b).  So the

2    Government's motion to admit that evidence at trial is

3    granted.  I will give a limiting instruction at the time

4    that evidence is admitted.  And if the parties are unable to

5    reach an accord on how that evidence will be presented, then

6    they can seek the view of the Court.

7              All right.  Now we're going to turn to the

8    defendant's motion to suppress any tangible evidence, which

9    is docketed at ECF 9.

10             So, Ms. Clark, do you have any witnesses to put

11   forward on that motion?

12             MS. CLARK:  Yes.  Just a couple of preliminary

13   matters, Your Honor, if I may.

14             THE COURT:  Yes.

15             MS. CLARK:  First, the Government has provided

16   *Jencks*, and we actually all provided all of our *Jencks*

17   back -- I think it was on October 2nd, when we thought we

18   were going to have the original motions hearing in this

19   case.  There is no *Giglio* for the officers, or we would have

20   provided that.

21             We have provided to the defense the Government's

22   exhibit list and a colored copy of all of the exhibits.  And

23   I have extra copies of the Government's exhibit list, if the

24   Court would like -- or the Court staff would like extra

25   copies.

1              And the Government would like to call two

2       witnesses this afternoon, and we are prepared to proceed.

3              THE COURT:  All right.  Let's proceed.

4              MS. CLARK:  The Government first calls to the

5       stand Officer Scott Biel.

6              (SCOTT BIEL, Government witness, sworn.)

7              THE COURT:  Good afternoon.

8              THE WITNESS:  Good afternoon.

9              MS. CLARK:  May I proceed, Your Honor?

10             THE COURT:  Yes.  Please do.

11                        DIRECT EXAMINATION

12      BY MS. CLARK:

13      Q.  Good afternoon.  Would you please introduce yourself to

14      the Court, and spell your last name.

15      A.  I am Officer Scott Biel.  Last name is B-I-E-L.

16      Q.  Are you employed?

17      A.  Yes, ma'am.

18      Q.  Are you employed?

19      A.  Yes, ma'am.

20      Q.  And I will ask if you can keep your voice up.

21             Who are you employed by?

22      A.  The United States Secret Service.

23      Q.  How long have you worked for the United States Secret

24      Service?

25      A.  More than 11 years.

1    Q.   What is your current rank or title?

2    A.   I am an officer.

3    Q.   What is your current assignment with the Secret Service?

4    A.   I am currently assigned to the Crime Scene Search Unit.

5    Q.   And how long have you been assigned to the Crime Scene

6    Search Unit?

7    A.   A couple of months.

8    Q.   Okay.  And prior to being assigned to the Crime Scene

9    Search Unit, what unit were you assigned?

10   A.   I was assigned to the White House branch Counter

11   Surveillance Unit.

12   Q.   And how long were you assigned to the White House branch

13   surveillance unit?

14   A.   I was a permanent member for five years.  And three

15   years prior to that, I was an alternate member.

16   Q.   Okay.  Briefly, what are your -- and I would like to

17   focus on May of 2018.  What were your duties and

18   responsibilities when you were assigned to the White House

19   branch, the patrol division?

20   A.   I was assigned to a marked police cruiser to patrol the

21   White House zone.

22   Q.   Okay.  And what jurisdiction within Washington, D.C. did

23   you have at that time?

24   A.   I had jurisdiction through the entire city of

25   Washington, D.C.

1    Q.  And are you a federal law enforcement officer?

2    A.  Yes, ma'am.

3    Q.  During the course of your law enforcement career,

4    approximately how many traffic stops have you been involved

5    in?

6    A.  Thousands.

7    Q.  And during the course of your law enforcement career,

8    approximately how many traffic stops have you been involved

9    in where a vehicle was operating without headlights?

10   A.  Hundreds of them.

11   Q.  And during the course of your law enforcement career,

12   approximately how many times have you smelled the odor of

13   marijuana?

14   A.  Thousands of times.

15   Q.  And finally, during of course of your law enforcement

16   career, approximately how many times have you seen

17   marijuana?

18   A.  Hundreds of times.

19   Q.  Now, Officer Biel, I would like to direct your attention

20   to May 16th, 2018.  Did you work those early morning hours

21   of that day?

22   A.  Yes, I did.

23   Q.  What hours did you work?

24   A.  My shift was from 10:00 p.m., starting on May 15th,

25   through 06 a.m. on the 16th of May.

1   Q.   Okay.  How were you dressed for work that late night of

2   May 15th of 2018 going into the early morning hours of

3   May 16th, 2018?

4   A.   I was in full police uniforms with police markings on

5   the rear and the front of my uniform.

6   Q.   What markings were those police markings?

7   A.   On the rear, the letters are about six inches high,

8   they're reflective in nature, and it's the word "police."

9   On the front of the vest, the letters are about two inches

10  high, and it says "Secret Service."

11  Q.   Okay.  And for that work -- for that day, or early

12  morning hours, what were you assigned to, a patrol car?

13  Were you on foot beat or on bike patrol?

14  A.   I was assigned to a marked police cruiser.

15  Q.   Okay.  And what do you mean by "marked"?

16  A.   It has police markings on all sides of the vehicle, and

17  it also has emergency equipment; lights and sirens.

18  Q.   Okay.  Were you working with a partner that morning?

19  A.   Yes, I was.

20  Q.   And who was your partner?

21  A.   Officer Agnimel.

22  Q.   Who drove the Secret --

23          THE COURT:  Could you spell that name?

24          MS. CLARK:  Sorry.  Thank you.

25  BY MS. CLARK:

1    Q.  Could you spell that name?

2    A.  It's A-G-N-I-M-A-L.

3            MS. CLARK:  May I continue?

4            THE COURT:  Yes.

5    BY MS. CLARK:

6    Q.  Who drove the police car that morning of May 16th, 2018?

7    A.  I was driving the vehicle at that time.

8    Q.  Officer Biel, I would like to direct your attention to

9    approximately 1:19 in the morning of May 16th, 2018.  Do you

10   recall where you were around that time?

11   A.  Yes, ma'am.  I was driving westbound on Constitution

12   Avenue and proceeded to make a right-hand turn onto 17th

13   Street Northwest to drive northbound.

14   Q.  What were the natural lighting conditions at that time?

15   A.  It was dark out.

16   Q.  What, if any, artificial lighting conditions existed at

17   that time, on 17th Street Northwest?

18   A.  The street lights, at that intersection or that quadrant

19   of the city, are very dim.

20   Q.  Okay.  What, if anything, did you observe or caught your

21   attention while you were on 17th Street Northwest?

22   A.  There was a black BMW driving on southbound 17th Street

23   Northwest with no lights running.

24   Q.  How far were you from that BMW when you first saw the

25   BMW?

1    A.  Approximately two blocks.

2    Q.  Okay.  What did you do when you saw the BMW driving or

3    being operated without headlights?

4    A.  I waited until the vehicle passed me, and proceeded to

5    make a U-turn.

6    Q.  And where did you make your U-turn?

7    A.  I made the U-turn at D Street and 17th Street.

8    Q.  Why did you wait for the BMW to pass you?

9    A.  Just from a safety standpoint, I needed to make sure

10   that traffic was clear before I made a U-turn.

11   Q.  After you conducted the U-turn, what did you do?

12   A.  I activated my emergency equipment and conducted a

13   traffic stop of the vehicle.

14   Q.  And where did you actually conduct that traffic stop?

15   A.  The traffic stop was conducted on 17th Street, just

16   north of Constitution Avenue.

17   Q.  What, if anything else, did you do simultaneously when

18   you activated the emergency equipment on your car?

19   A.  Using my radio in the vehicle, I requested a check of

20   the tag on the vehicle.

21   Q.  Okay.  And why did you do that?

22   A.  That's standard procedure.

23   Q.  Okay.  So what did you do after you activated your

24   emergency equipment on your car?

25   A.  I conducted a traffic stop of the vehicle.

1    Q.   What did the BMW do?

2    A.   The vehicle pulled over to the curb lane of the street.

3    Q.   Okay.  And, approximately, where on 17th Street did the

4    BMW stop?

5    A.   It stopped just north of Constitution Avenue.

6    Q.   Okay.  And then what did you do after the BMW stopped?

7    A.   After running the tag check, we approached the vehicle.

8    Q.   Okay.  And what were the lighting conditions like in the

9    area where the BMW stopped?

10   A.   The lighting conditions of that quadrant is very dim.

11   Q.   Okay.  How far behind the BMW did you stop your police

12   vehicle?

13   A.   Approximately ten feet.

14   Q.   Okay.  And once you stopped your vehicle, what did you

15   do?

16   A.   We approached the vehicle.

17   Q.   Okay.  What side did you approach the BMW on?

18   A.   I approached on the driver's side.

19   Q.   Okay.  While you were walking up to the BMW, what, if

20   anything, did you learn about the license tag that you had

21   requested to be run?

22   A.   The tag came back valid.

23   Q.   Okay.  Did you have an opportunity to look at the BMW as

24   you were walking up toward it?

25   A.   The BMW had dark tinted windows.

1    Q.  Okay.  Would you recognize that car if you saw a picture

2    of it again?

3    A.  Yes, ma'am.

4    Q.  I'm going to ask you to look at --

5              MS. CLARK:  Actually, may I approach?

6              THE COURT:  Yes, you may.

7              MS. CLARK:  My monitor has a glare.  I'm not sure

8    if the witness' monitor has a glare.  Does it have a glare?

9              THE COURT:  I can see on the witness' screen.

10             When you're asking for a glare, are you talking

11   about the license plate number?

12             MS. CLARK:  Yes.

13             THE COURT:  Yeah.  We can't see that.

14             MS. CLARK:  Pardon?

15             THE COURT:  We can't see that.

16             MS. CLARK:  May I approach the witness, Your

17   Honor?

18             THE COURT:  Yes, you may.

19             MS. CLARK:  Okay.  Your Honor, for the record, the

20   Government has handed the witness Government's Exhibit

21   No. 1.

22   BY MS. CLARK:

23   Q.  And I'd ask you to take a look at that, Officer Biel.

24   And when you are done, if you could, look up, please.

25             Do you recognize Government's Exhibit No. 1?

1    A.  Yes, ma'am.

2            That is a photograph of the vehicle that I

3    conducted a traffic stop on.

4    Q.  Is that a fair and accurate picture of the vehicle?

5    A.  Yes, ma'am.

6    Q.  And how do you know this is the same BMW that you

7    stopped the morning of May 16th, 2018?

8    A.  The Maryland tag on the rear of the vehicle.

9            MS. CLARK:  At this time, Your Honor, the

10   Government would move into evidence Government's Exhibit

11   No. 1.

12           THE COURT:  Any objection?

13           MR. McDANIEL:  No objection, Your Honor.

14           THE COURT:  Hearing no objection, it will be

15   received into evidence.

16           (Government's Exhibit 1, admitted.)

17           MS. CLARK:  May I retrieve the exhibit, Your

18   Honor?

19           THE COURT:  Yes, you may.

20           MS. CLARK:  Your Honor, I have an extra.  I can

21   either publish this to the Court, or I have an extra photo,

22   color photocopy, that I could submit -- a copy --

23           THE COURT:  That would be great.

24           MS. CLARK:  Okay.

25   BY MS. CLARK:

1    Q.  Officer Biel, when you approached the BMW, what, if

2    anything, did you have in your hand?

3    A.  My flashlight.

4    Q.  What hand was that in?

5    A.  My left hand.

6    Q.  Why did you have your flashlight out?

7    A.  Due to the lighting conditions, I used my flashlight to

8    illuminate the interior of the vehicle.

9    Q.  Okay.  And what did you do with your flashlight as you

10   were walking toward that BMW?

11   A.  I observed all the occupants of the vehicle.

12   Q.  And how many individuals were in the BMW?

13   A.  Three.

14   Q.  And do you recall where they were seated?

15   A.  Yes, ma'am.

16   Q.  Where were they seated?

17   A.  There was a driver in the driver's seat.  There was a

18   passenger in the front passenger seat.  And there was a

19   passenger in the rear seat behind the frontier passenger.

20   Q.  Did you have your service weapon with you that morning

21   while you were working?

22   A.  Yes, I did.

23   Q.  When you were approaching the vehicle, where was your

24   service weapon?

25   A.  In my holster.

1    Q.   Okay.  At any time when you approached the vehicle, did

2    you take that weapon out of the holster?

3    A.   No, I did not.

4    Q.   Okay.  Where did you -- did there come a time where you

5    stopped walking when you were approaching the BMW?

6    A.   I stopped at the vehicle frame in between the front and

7    rear side window.

8    Q.   Okay.  On what side of the car?

9    A.   The driver's side.

10   Q.   Why did you stop at that location?

11   A.   It's a tactical advantage.

12   Q.   Okay.  Did you have an opportunity to observe the driver

13   of the BMW at that time?

14   A.   Yes, I did.

15   Q.   And was the driver's side window up or down?

16   A.   The driver's side window was down at that time.

17   Q.   Okay.  Would you recognize that person if you saw that

18   person again?

19   A.   Yes, ma'am.

20   Q.   Officer Biel, I'd ask you to look around the courtroom.

21   And if you see the individual who was driving the BMW that

22   morning, identify that person by the location in the

23   courtroom and an article of clothing.

24   A.   The defendant is sitting behind you in an orange outfit.

25             MS. CLARK:  Your Honor, may the record reflect an

1    in-court identification of the defendant.

2          THE COURT:  Let the record so reflect.

3    BY MS. CLARK:

4    Q.  Okay.  When you stopped by the BMW, how far were you, in

5    terms of your distance, from the BMW at that time?

6    A.  I was within an arm's length of the vehicle.

7    Q.  What did you do when you reached close to the driver's

8    window?

9    A.  My initial contact with the defendant was to explain or

10   identify myself and explain the reason for the traffic stop.

11   Q.  What did you tell the defendant the reason for the

12   traffic stop was?

13   A.  I explained to the defendant that I conducted this

14   traffic stop based on there was no lights illuminated on the

15   car.

16   Q.  Okay.  And what, if any, response did the defendant

17   provide?

18   A.  At the point of conversation, I utilized my flashlight

19   to illuminate the part of the dash that would illuminate the

20   lights on the car, at which point in time the defendant

21   turned the lights on the car.

22   Q.  Why did you do that?

23   A.  The reason for the traffic stop was a public safety

24   issue of no lights running, as my responsibility to ensure

25   that that has been taken care of prior to the termination of

1      the traffic stop.

2      Q.  What was your tone of voice when you were talking to the

3      defendant?

4      A.  It was a firm tone.

5      Q.  Okay.  What, if anything, else did you say to the

6      defendant while you were at the driver's side or by the

7      driver's side window?

8      A.  I asked the defendant who had been smoking marijuana

9      within the vehicle.

10     Q.  Why did you ask him that question?

11     A.  There was an odor of marijuana emanating from the

12     vehicle.

13     Q.  Okay.  How soon after you approached the BMW by the

14     driver's side window did you smell the odor of marijuana?

15     A.  It was immediate.

16     Q.  And how strong was that odor?

17     A.  It was a moderate odor.

18     Q.  Okay.  And what, if anything, did the defendant say or

19     do after you asked him that question?

20     A.  The defendant stated that nobody had been smoking

21     marijuana within the vehicle; however, at one point in time,

22     he picked up a -- an amount of marijuana wrapped in a $1

23     bill and showed it to me and stated that:  This is all we

24     have.

25     Q.  Okay.  And what were you doing with your flashlight at

1   the time that the defendant picked up that $1 bill and

2   showed it to you?

3   A.  I was illuminating his hand movements with my

4   flashlight.

5   Q.  And can you describe for the Court what you saw when the

6   defendant had the $1 bill and how he was holding it toward

7   you?

8   A.  There was a bud of marijuana -- or what appeared to be a

9   bud of marijuana wrapped in a $1 bill.  The defendant picked

10  it up from the center console of the vehicle, put it towards

11  me, with the open end of the rolled-up $1 bill facing me --

12  Q.  Uh-huh.

13  A.  -- displaying to me the amount of marijuana that he had.

14  Q.  Now, how were you feeling at the time when the defendant

15  was moving with his hands to pick up that $1 bill from the

16  center console area and then showed you what was inside the

17  $1 bill?

18          MR. McDANIEL:  Objection.

19          THE COURT:  Sustained.

20  BY MS. CLARK:

21  Q.  While you were there at the driver's side window, what,

22  if anything else, did you ask for, in terms of

23  identification from the defendant?

24  A.  I asked the defendant for his license, registration, and

25  proof of insurance.

```
 1    Q.  What, if anything, did he provide to you?
 2    A.  He provided a hard copy Maryland license, as well as the
 3    registration for the vehicle.
 4    Q.  Regarding proof of insurance, what, if anything, did the
 5    defendant provide regarding proof of insurance?
 6    A.  The defendant could not provide valid proof of
 7    insurance.
 8    Q.  And what, if any -- what, if anything, did you say or do
 9    regarding who -- why he could not provide proof of insurance
10    and ownership of the vehicle?
11    A.  I questioned the defendant on whose vehicle it was,
12    because my knowledge and experience has taught me that the
13    insurance --
14              MR. McDANIEL:  Objection, Your Honor.
15              THE COURT:  I'm sorry.  Say that again.
16              MR. McDANIEL:  Objection -- sorry.  Objection,
17    Your Honor.
18              THE COURT:  Overruled.
19    BY MS. CLARK:
20    Q.  You may continue.
21    A.  My knowledge and experience has taught me that the
22    notice of infractions for insurance won't hold up in court
23    if the driver of the vehicle is not the registered owner.
24    Q.  Okay.  And what, if anything, did the defendant say to
25    you as to whether the vehicle belonged to him?
```

1    A.   The defendant explained to me that the vehicle belonged

2    to his girlfriend.

3              MS. CLARK:   Okay.   Your Honor, may I approach the

4    witness again?

5              THE COURT:   Yes, you may.

6    BY MS. CLARK:

7    Q.   Okay.   Officer Biel, I'm going to show you what's been

8    marked for identification as Government's Exhibit No. 2.

9              I would ask you to look at that.   And when you're

10   done, look up, please.

11             Do you recognize Government's Exhibit No. 2?

12   A.   Yes, ma'am.

13   Q.   What is Government's Exhibit No. 2?

14   A.   That is showing the front driver's side area of the

15   vehicle, as well as the center console area of the vehicle.

16   Q.   Is that a fair and accurate picture of the inside of the

17   vehicle as you viewed it the morning of May 16th, 2018?

18   A.   Yes, ma'am.

19             MS. CLARK:   Your Honor, at this time we'd move

20   Government's Exhibit No. 2 into evidence.

21             THE COURT:   Any objection?

22             MR. McDANIEL:   No objection.

23             THE COURT:   Hearing no objection, Government's

24   Exhibit 2 will be admitted.

25             (Government's Exhibit 2, admitted. )

1  BY MS. CLARK:

2  Q.  Officer Biel, do you see the area that you referred

3  to -- the center console area -- where you saw the defendant

4  obtain that $1 bill from?

5  A.  Yes, ma'am.

6        MS. CLARK:  May I approach the witness?

7        THE COURT:  Yes, you may.

8  BY MS. CLARK:

9  Q.  I'd ask you to use this marker and, if you could, just

10  circle that general area that you referred to.

11  A.  (Witness complies.)

12        MS. CLARK:  And I will take this back.

13        And, for the record, I am taking Government's

14  Exhibit No. 2 from the witness.

15        And I will show it to defense counsel, please.

16        THE COURT:  Thank you.

17        MR. McDANIEL:  Uh-huh.

18        MS. CLARK:  And may I publish this to the Court,

19  Your Honor?

20        THE COURT:  Yes, please.

21  BY MS. CLARK:

22  Q.  Officer Biel, where, again, did the -- what did the

23  defendant do with that $1 bill after he showed it to you?

24  A.  After he showed me the $1 bill with the apparent

25  marijuana, he put it into the center dash area by the radio.

1          MS. CLARK:  Okay.  Permission to approach the

2     witness?

3          THE COURT:  Yes, you may.

4     BY MS. CLARK:

5     Q.  Okay.  Officer Biel, I'm handing to you Government's

6     Exhibit No. 3; and I'd just ask you to take a look at it.

7     And look up when you are done, please.

8          Do you recognize Government's Exhibit No. 3?

9     A.  Yes, ma'am.

10    Q.  What is Government's Exhibit No. 3?

11    A.  That is a photograph of the interior of the vehicle from

12    the passenger side.

13    Q.  Okay.  And is that a fair and accurate picture of how it

14    looked that morning to you when you looked into the vehicle?

15    A.  Yes, ma'am.

16         MS. CLARK:  Your Honor, the Government would move

17    Government's Exhibit No. 3 into evidence.

18         THE COURT:  Any objection?

19         MR. McDANIEL:  No objection.

20         THE COURT:  Hearing no objection, Government

21    Exhibit 3 will be admitted.

22         (Government Exhibit 3, admitted.)

23    BY MS. CLARK:

24    Q.  Officer Biel, I would ask you with the marker -- again,

25    if you see the area where the defendant placed the $1 bill

1     after he showed it to you, could you please circle that

2     area --

3     A.  Yes, ma'am.

4     Q.  -- on Government's Exhibit No. 3?

5     A.  (Witness complies.)

6              MS. CLARK:  And permission to approach to retrieve

7     the exhibit?

8              THE COURT:  Yes.  Of course.

9              MS. CLARK:  For the record, I'm publishing

10    Government's Exhibit No. 3 to Mr. McDaniel.

11             MR. McDANIEL:  Thank you.

12             MS. CLARK:  May I publish this to the Court, Your

13    Honor?

14             THE COURT:  Yes.  Thank you, Ms. Clark.

15             MS. CLARK:  Permission to approach the witness?

16             THE COURT:  Yes.

17    BY MS. CLARK:

18    Q.  Officer Biel, I'm handing you what's been premarked for

19    identification as Government's Exhibit No. 4.

20             I would ask you to take look at that.  And when

21    you're done, please look up.

22             Do you recognize Government's Exhibit No. 4?

23    A.  Yes, I do.

24    Q.  What is Government's Exhibit No. 4?

25    A.  That is a photograph of the amount of marijuana wrapped

1    in the $1 bill that the defendant showed me.

2    Q.  Is that a fair and accurate picture of that item?

3    A.  Yes, ma'am.

4         MS. CLARK:  Your Honor, at this time, we'd move

5    Government's Exhibit No. 4 into evidence.

6         THE COURT:  Any objection?

7         MR. McDANIEL:  No objection.

8         THE COURT:  Hearing no objection, it will be

9    admitted.

10         (Government's Exhibit 4, admitted.)

11         MS. CLARK:  And permission to publish to the

12    Court?

13         THE COURT:  Thank you.

14    BY MS. CLARK:

15    Q.  After you obtained the defendant's license and

16    registration, and he showed you the $1 bill with what

17    appeared to be a bud of marijuana inside, what did you do

18    after that?

19    A.  I retreated back to my patrol car so that -- the front

20    quarter panel passenger side -- and requested a name and

21    license check of the defendant.

22    Q.  Okay.  And what, if anything, did you direct other

23    officers to do?

24    A.  At that point in time, I had made the decision to remove

25    all the occupants of the vehicle to conduct a probable cause

1    search for additional marijuana in the vehicle; and I

2    directed other officers to start removing the passengers of

3    the vehicle.

4    Q.   Okay.  And do you know a United States Secret Service

5    officer by the name of Michael Amaturo?

6    A.   Yes, I do.

7    Q.   Was he on the scene of that traffic stop at that time?

8    A.   No, he was not.

9    Q.   Okay.  What did the officers do in relation to your

10   direction -- your telling them to take the individuals out

11   of the vehicle?

12   A.   Officer Agnimel and Officer Dirienzo removed the rear

13   passenger of the vehicle, detained that person, and sat them

14   on a curb next to the OIS building.

15   Q.   Okay.  And then what happened after the rear-seat

16   passenger was removed?

17   A.   At that point, Officer Agnimel and Officer Adorno

18   removed the front passenger of the vehicle.

19   Q.   Okay.  And where was the defendant at the time that that

20   was occurring?

21   A.   The defendant was sitting in the driver's seat.

22   Q.   Did there come a time where your focus returned to the

23   defendant for a particular reason?

24   A.   As the second passenger was being detained, the

25   defendant stepped out of the vehicle without being asked to

 1    do so.

 2    Q.  How far --

 3            THE COURT:  Can I slow you down for just a second?

 4            When you say that the passengers -- the rear

 5    passenger and the front passenger were removed from the

 6    vehicle, do you mean you asked them to step out of the

 7    vehicle; or was there some other way that they were removed

 8    from the vehicle?

 9            THE WITNESS:  They were asked to step out; and

10    they voluntarily stepped out of the vehicle.

11            THE COURT:  Right.  And then, when they were

12    detained, did you cuff them at the time?

13            THE WITNESS:  Yes, ma'am.

14            THE COURT:  Okay.

15    BY MS. CLARK:

16    Q.  And did -- were they front cuffed or rear cuffed?

17    A.  They were handcuffed in the rear.

18    Q.  And why were they handcuffed at that time, the front and

19    rear-seat passenger?

20    A.  For overall safety of everybody involved.

21    Q.  Okay.  When the defendant voluntarily got out of the BMW

22    without being asked to, how far were you from the defendant

23    at that time?

24    A.  When the initial passengers were being removed from the

25    vehicle, I was standing at the rear corner -- rear driver's

1    side of the vehicle.  When the defendant stepped out of the

2    vehicle, I stepped up to the defendant at the driver's side

3    door.

4    Q.  And when you're referring to the "vehicle," what vehicle

5    are you referring to?

6    A.  The BMW that we had conducted the traffic stop.

7    Q.  What, if anything, did the defendant have in his hands

8    when he got out of the BMW?

9    A.  The defendant had his cell phone in his hand.

10   Q.  Okay.  What did you do or say when you saw the defendant

11   getting out of the BMW?

12   A.  I requested the defendant put down his cell phone.

13   Q.  And what, if anything, did the defendant do in response

14   to that request?

15   A.  The defendant did not adhere to my request to put down

16   the cell phone.

17   Q.  How many times did you ask him to put his cell phone

18   down?

19   A.  Multiple times.

20   Q.  At any time did he comply?

21   A.  No, ma'am.

22   Q.  And what did the defendant do?

23   A.  The defendant then started to walk around the door of

24   the vehicle towards the front of the car.

25   Q.  And what happened next?

1   A.  When the defendant got to the front corner of the

2   vehicle, the defendant took off at a sprint.

3   Q.  What direction did the defendant run?

4   A.  His initial direction of travel was southbound on 17th

5   Street.

6   Q.  And could you see where he went after he initially

7   started southbound on 17th?

8   A.  The defendant then made a right to go westbound onto

9   Constitution Avenue.

10  Q.  Okay.  What did you do when you saw the defendant start

11  to run?

12  A.  Put it on the radio, that we had an individual fleeing

13  on foot, and proceeded to return to my vehicle to pursue the

14  individual.

15  Q.  Did you provide a description of the individual who was

16  fleeing?

17  A.  Yes, ma'am.

18  Q.  Do you recall that description?

19  A.  Yes, ma'am.

20  Q.  What was that description?

21  A.  Five-foot-ten, two hundred and fifty pounds, black male

22  wearing dark clothes.

23  Q.  Okay.  Did other officers and/or law enforcement

24  agencies assist with the search of the defendant?

25  A.  There was multiple U.S. Secret Service personnel that

1   were involved, as well as -- U.S. Park Police was contacted

2   to assist us in the search.

3   Q.  And did you also search that area --

4   A.  Yes, ma'am.

5   Q.  -- around Constitution and that 17th Street area?

6   A.  Yes, ma'am.

7   Q.  While you were searching that area, did there come a

8   time where you heard additional information on your police

9   radio about the person who fled, the defendant?

10  A.  Approximately five minutes into the canvas for the

11  defendant, it was put on the radio that there was a loaded

12  magazine found in the door pocket of the vehicle.

13  Q.  Did you recognize the voice of the individual who put

14  that information -- said that information on the radio?

15  A.  Yes, ma'am.

16  Q.  Who was that?

17  A.  Officer Amaturo.

18  Q.  Okay.  And how did that information change the search,

19  if any --

20  A.  The search went from a fleeing suspect to a possibly

21  armed suspect.

22  Q.  Did there come a time when the defendant was located or

23  found?

24  A.  Yes, ma'am.

25  Q.  Where was he found?

1    A.   He was found at East Basin Drive at Main Avenue.

2    Q.   And how did you learn that information?

3    A.   It was put out over the radio that U.S. Park Police had

4    detained an individual that matched the lookout.

5    Q.   And where were you at the time you heard that

6    information?

7    A.   I was on the east side of the Kutz Bridge.

8    Q.   What did you do when you heard that information?

9    A.   I responded to the park police location.

10   Q.   And what did you do once you got there?

11   A.   I positively identified the defendant as the driver of

12   the vehicle who fled.

13   Q.   Okay.  And what, if anything, was given to you while you

14   were there with the defendant and officers of the United

15   States Park Police?

16   A.   When park police detained the individual, they did an

17   immediate search for weapons of the defendant, at which

18   point in time they took out a large -- large sum of cash and

19   two cell phones out of his right front pocket.

20   Q.   And do you know, approximately, how much cash was

21   recovered from the defendant?

22   A.   The initial amount was $2,680.

23   Q.   Okay.  Did there come a time when you returned to the

24   BMW and where the initial traffic stop occurred?

25   A.   Yes, ma'am.

1   Q.  And when did you return to that location?

2   A.  The agreement with U.S. Park Police was to do a

3   temporary detention of the defendant at their D-1

4   substation, which then allowed me to return to the scene at

5   17th at Constitution.

6   Q.  Okay.  And so why did you decide to go back there to

7   that scene where the traffic stop initially occurred?

8   A.  Crime scene search had been requested to respond to the

9   scene, so I needed to talk to the individual there, as well

10  as -- there were still two defendants on the scene.

11  Q.  Did you have an opportunity to talk to the crime scene

12  search officer?

13  A.  Yes, I did.

14  Q.  And what, if anything, did you learn from the crime seen

15  search officer about what, if anything, was recovered from

16  the BMW?

17  A.  Crime Scene Search Officer Zolton recovered one .40

18  caliber magazine with nine rounds of ammunition from the

19  door pocket; a Glock 27 with a 22-round magazine, with

20  20 rounds of ammunition from underneath the driver's side

21  floor mat.  She also recovered the marijuana wrapped in the

22  $1 bill from the radio area of the center console; and there

23  was a marijuana grinder in the center console area as well.

24          MS. CLARK:  Okay.  Permission to approach the

25  witness, Your Honor?

```
 1              THE COURT:  Yes, you may.
 2    BY MS. CLARK:
 3    Q.  Officer Biel, I'm going to show you what's been marked
 4    for identification as Government's Exhibit No. 5.  I would
 5    ask you to take a look at that, please.
 6              Do you recognize Government's Exhibit No. 5?
 7    A.  Yes, ma'am.
 8    Q.  What is Government's Exhibit No. 5?
 9    A.  That is the marijuana grinder that was recovered from
10    the center console of the vehicle.
11    Q.  And what vehicle are you referring to?
12    A.  The vehicle that the defendant was driving.
13    Q.  Okay.  Is that a fair and accurate picture?
14    A.  Yes, ma'am.
15              MS. CLARK:  Your Honor, at this time, we'd move
16    Government's Exhibit No. 5 into evidence.
17              THE COURT:  Any objection?
18              MR. McDANIEL:  No objection.
19              THE COURT:  Hearing no objection, it will be
20    admitted.
21              (Government's Exhibit No. 5, admitted.)
22              MS. CLARK:  And permission to publish to the
23    Court?
24              THE COURT:  Thank you.
25              MS. CLARK:  And may I approach one final time,
```

1    Your Honor?

2            THE COURT:  Of course.

3    BY MS. CLARK:

4    Q.  Officer Biel, I'm handing to you what's been premarked

5    for identification as Government's Exhibit No. 6.

6            Please look at that document.  And when you are

7    done, if you could, look up.

8            Do you recognize Government's Exhibit No. 6?

9    A.  Yes, ma'am.

10   Q.  What is Government's Exhibit No. 6?

11   A.  That is the Notice of Infraction that I issued to the

12   defendant for driving with no lights.

13   Q.  Okay.  And how do you know this is the Notice of

14   Infraction that you issued?

15   A.  It's my handwriting.  It's -- it's my Notice of

16   Infraction.

17   Q.  Okay.  And is that for the defendant and for the date

18   that this incident occurred?

19   A.  Yes, ma'am.

20           MS. CLARK:  Your Honor, at this time -- is that a

21   fair -- I'm sorry.  One final question.

22   BY MS. CLARK:

23   Q.  Is that a fair and accurate copy of the original Notice

24   of Infraction?

25   A.  Yes, ma'am.

1          MS. CLARK:  Your Honor, at this time, we'd like to

2     move Government's Exhibit No. 6 into evidence.

3          THE COURT:  Any objection?

4          MR. McDANIEL:  No objection.

5          THE COURT:  Hearing no objection, it will be

6     admitted.

7          (Government's Exhibit 6, admitted.)

8          When did you have time to write that?

9          THE WITNESS:  It was part of the process, ma'am.

10          THE COURT:  So this was after you had already

11     taken the defendant to temporary detention?

12          THE WITNESS:  That is correct.

13          THE COURT:  Okay.

14          MS. CLARK:  May I publish this, Your Honor, to the

15     Court?

16          THE COURT:  Yes.

17     BY MS. CLARK:

18     Q.  Officer Biel, you mentioned that the defendant was taken

19     back temporarily to United States Park Police, police

20     district.  What, if anything, was conducted regarding the

21     search of the defendant at that police district?

22     A.  When U.S. Park Police brought them into their

23     substation, they did a secondary complete search of the

24     defendant.

25     Q.  And what, if anything, was found during that search?

1    A.  They found an additional 205 U.S. dollars, as well as a

2    $1 bill that was folded up into an envelope type that

3    contained a white crystal-like substance.

4             MS. CLARK:  Okay.  No further questions, Your

5    Honor.

6             THE COURT:  Do you know where the white crystal

7    substance and the $205 were found?

8             THE WITNESS:  In the same pocket as the initial

9    wad of cash.

10            THE COURT:  Okay.

11                        CROSS-EXAMINATION

12   BY MR. McDANIEL:

13   Q.  Good afternoon, Officer Biel.

14   A.  Good afternoon.

15   Q.  You were driving your vehicle on the evening that we've

16   been discussing?

17   A.  Yes, sir.

18   Q.  And I'm sorry, you may have described this.

19            Did -- is your vehicle a marked vehicle or is it

20   unmarked?

21   A.  It is a marked police cruiser.

22   Q.  Do you have lights on the top of the cruiser?

23   A.  Yes, I do.

24   Q.  On this evening, you were with another officer that was

25   in your vehicle; is that right?

1    A.   That is correct.

2    Q.   Who was that?

3    A.   Officer Agnimel.

4    Q.   What time did you all start your tour of duty on that

5    evening?

6    A.   10:00 p.m.

7    Q.   And I think you testified it was about 1:19 that you

8    first saw the BMW vehicle?

9    A.   That is correct.

10   Q.   Now, when you saw the vehicle -- the BMW vehicle, you

11   were actually on 17th Street Northwest; is that right?

12   A.   That is correct.

13   Q.   How many lanes of traffic is that on both sides?

14   A.   There is three lanes of traffic that go northbound, and

15   there is two lanes of traffic that go southbound.

16   Q.   And you were traveling northbound?

17   A.   Yes, sir.

18   Q.   And the vehicle in question, the BMW, was traveling

19   southbound, the opposite direction?

20   A.   That is correct.

21   Q.   When you first saw the BMW vehicle, were you at a

22   standstill or were you in motion when you were driving?

23   A.   My vehicle was in motion at that time.

24   Q.   And were there other vehicles that were in front of you

25   at the time that you were traveling north on 17th Street?

1    A.  Not to my recollection, sir.

2    Q.  Do you recall there being any other calls -- cars on

3    17th Street, either traveling northbound or southbound,

4    other than your vehicle and the BMW?

5    A.  There was additional vehicles traveling southbound on

6    that street.

7    Q.  Were these additional vehicles in front of the BMW,

8    behind the BMW vehicle, if you recall?

9    A.  The vehicles that you're asking about traveling were in

10   front of the BMW.

11   Q.  And as the BMW passed, you were able to see that it

12   didn't have lights on?

13   A.  As soon as I made the turn to go northbound on 17th

14   Street, I was able to observe the BMW with no lights

15   running.

16   Q.  So when you made that turn, how -- how far away from

17   your vehicle was the BMW traveling the opposite direction

18   southbound on 17th?

19   A.  About two blocks.

20   Q.  Were you actually able to see the vehicle at that time?

21   A.  Yes, I was.

22   Q.  Okay.  Because I thought you told us earlier that the --

23   the lighting was dim in and around that area; is that right?

24   A.  That is correct.

25   Q.  But even with that, you were able to see it?

1    A.  Yes, sir.

2    Q.  Okay.  When you saw the vehicle traveling without any

3    lights on, did you say anything to your partner that was

4    traveling with you?

5    A.  I don't recall, sir.

6    Q.  Do you recall him saying anything to you about seeing

7    the vehicle without any lights on?

8    A.  I don't recall, sir.

9    Q.  Do you remember if you said anything to him, such as

10   "Oh, I am going to make a U-turn," or "I see this car that's

11   traveling without any lights"?  Do you remember saying

12   anything?

13   A.  I don't recall, sir.

14   Q.  But then you made the U-turn; is that right?

15   A.  That is correct.

16   Q.  And did you then have to speed up in order to get behind

17   the BMW before you activated your lights?

18   A.  When you are making a U-turn, it's a slower speed than

19   average travel, so yes.

20   Q.  Okay.  And did you activate your lights immediately upon

21   making the U-turn or was it sometime after you completed the

22   U-turn that you had initiated your lights?

23   A.  After completing the U-turn I activated my lights.

24   Q.  And the BMW vehicle pulled over immediately; is that

25   right?

1    A.  That is correct.

2    Q.  And you told us that you actually approached the vehicle

3    from the driver's side; is that right?

4    A.  That is correct.

5    Q.  Now, are you then walking in the street to approach the

6    driver's side of the vehicle?

7    A.  The way you position your vehicle, you take up an

8    additional part of the second travel lane, that gives you a

9    safe distance or safe space between your car and the vehicle

10   you pulled over.

11   Q.  Okay.  And you did that, right?

12   A.  That is correct.

13   Q.  But then, when you got out of your vehicle, you

14   approached the vehicle -- and as you're walking toward the

15   vehicle, you're actually in the street; is that right?

16   A.  That is correct.

17   Q.  Now, the vehicle -- the BMW vehicle that you are

18   approaching -- and let me ask you this:  Did your partner

19   get out of the vehicle at the same time?

20   A.  Yes, sir.

21   Q.  And was your partner, then, approaching the BMW vehicle

22   from the opposite side of your vehicle on the sidewalk?

23   A.  My pass -- my partner was approaching the passenger side

24   of the vehicle.

25   Q.  Was he -- you don't know if he was on the sidewalk or

1    not?

2    A.  I don't recall, sir.

3    Q.  Okay.  Do you recall whether you got to the vehicle

4    first, or your partner?

5    A.  I don't recall.

6    Q.  When you got to the vehicle, did you then have to tap on

7    the window or was the window already rolled down?

8    A.  I believe the window was already down.

9    Q.  When you say "the window," you mean the window to the

10   driver's side of the --

11   A.  The driver's window was down.

12   Q.  Okay.  Now, when the vehicle passed you, could you tell

13   whether or not that window was down -- I'm now talking about

14   when you first see it, it doesn't have on lights and it goes

15   past you; could you tell whether or not that window was down

16   or not?

17   A.  I don't recall whether the window was down or not.

18   Q.  But the first time you recall making any note of the

19   window, the window was all the way down; is that right?

20   A.  That is correct.

21   Q.  Okay.  And this is May 6 -- May 16th; is that right?

22   A.  That is correct.

23   Q.  Can you tell the Court whether it was cool outside or

24   whether it was starting to be warm in the evening around

25   this time?

1    A.   It was a slight drizzle at that time.

2    Q.   And when you approach the car, you made contact with the

3    driver; is that right?

4    A.   Yes, sir.

5    Q.   And did he provide you with some documentation after you

6    asked him for some documentation at the window?

7    A.   Yes, he did.

8    Q.   What did he provide you with?

9    A.   He provided me with a hard copy Maryland driver's

10   license and the registration for the vehicle.

11   Q.   Now, before you got out to approach the vehicle, you had

12   already started to run the tag?

13   A.   The tag was run prior to approaching the vehicle, yes.

14   Q.   The information -- based upon your running the tag, did

15   you already have that information as you approached the

16   vehicle?

17   A.   I don't recall whether that information was given prior

18   to stepping out or when we were at the window itself.

19   Q.   Well, I'm asking now about -- when you say you run it,

20   I'm presuming that you put some information into your

21   computer and make a determination of whether or not the --

22   for instance, the tags are valid.

23   A.   The way our system works is we run it over the radio.

24   Q.   Okay.

25   A.   So there is somebody else running that information.

1    Q.  Yes, sir.  So then you -- you actually call in the tag.

2    And then somebody, at a remote location, runs that

3    information and then reports back to you what the findings

4    are; is that right?

5    A.  That is correct.

6    Q.  Okay.  So, as you are approaching, you don't have the

7    information.  But at some point in time, while you are

8    engaging with the driver of the vehicle, you receive the

9    information about the tag; is that right?

10   A.  Yes, sir.

11   Q.  Now, is this before or after he has provided you with

12   the information -- the paperwork for the registration?

13   A.  I don't recall.

14   Q.  But when you received the information that told you who

15   the owner of the vehicle -- who it was registered to, is

16   that right?

17   A.  Yes, sir.

18   Q.  When -- the information, when it's ran -- that's the

19   information that you're looking for, correct?

20   A.  Well, the information that's given is, typically,

21   whether the tag is valid or not.

22   Q.  But not the name of the registered owner of the vehicle?

23   A.  Sometimes they give it, sometimes they don't.

24   Q.  Do you remember whether they gave it to you on this

25   occasion?

1      A.  I don't recall.

2      Q.  But you knew that the tags were current.  They were

3      valid, is that right?

4      A.  That is correct.

5      Q.  And after you received the registration documents, it's

6      your testimony that you then asked the question whether or

7      not the occupants of the vehicle had any -- any marijuana in

8      the car; is that right?

9      A.  I asked who had been smoking marijuana in the car.

10     Q.  Okay.  All right.  And you say you asked that because

11     it's your testimony that you were able to smell a medium

12     smell of marijuana on this occasion?

13     A.  I said a moderate odor of marijuana.

14     Q.  Okay.  Very -- very well.

15           So, now, are you -- and I know you testified that

16     you smelled marijuana, I think you said, thousands of times;

17     is that right?

18     A.  Yes, sir.

19     Q.  Are you aware of the distinction between the smell of

20     burnt marijuana and unburned marijuana?

21     A.  No, sir.

22     Q.  So, from your experience, both burnt marijuana and

23     unburned marijuana smell the same; is that right?

24     A.  Yes, sir.

25     Q.  Because you agree with me that all of the marijuana that

1     you saw and/or recovered from the vehicle was unburned

2     marijuana; is that right?

3     A.  That is correct.

4     Q.  Okay.  So based upon the -- based upon the entirety of

5     the information that you both received from the driver of

6     the vehicle and the actual search of the vehicle, there was

7     no burned marijuana ever found in the vehicle or on any of

8     the persons that were taken from the vehicle, correct?

9     A.  That is correct.

10              THE COURT:  How would you see burned marijuana, if

11    you know, Officer?

12              THE WITNESS:  Typically, there is a residue that

13    can be tested for THC.  If -- if you got, like, an ashtray

14    that would have what would appear would be ash in it, it can

15    be tested for THC.

16              THE COURT:  Okay.

17              MR. McDANIEL:  Court's brief indulgence.

18              THE COURT:  Of course.

19              Officer, do you want some water?

20              THE WITNESS:  I'm fine, ma'am.

21    BY MR. McDANIEL:

22    Q.  And you've seen burnt marijuana before, sometimes there

23    might be a half-smoked blunt with black ashes on the blunts;

24    is that right?

25    A.  Yes, I have.

1    Q.   Okay.  But nothing like that in this case, right?

2    A.   There was none of that found in this vehicle.

3    Q.   Now, the vehicle that you were driving, was that vehicle

4    outfitted with a dash cam?

5    A.   No, sir.

6    Q.   Do you all have any vehicles that are outfitted with

7    dash cams?

8    A.   No, sir.

9             MS. CLARK:  Objection.  Relevance.

10            MR. McDANIEL:  I was really just asking because I

11    was --

12            THE COURT:  Overruled.

13    BY MR. McDANIEL:

14    Q.   Did you, on that evening, have body-worn camera on?

15    A.   No, sir.

16    Q.   And so after Mr. Reynoso provides you with the

17    registration to the vehicle, it's your testimony that he

18    tells you that he -- there was no one smoking marijuana?

19    A.   Yes, sir.

20    Q.   But that -- that all he had was -- or all they had was

21    the marijuana which was in the dollar -- the $1 bill; is

22    that right?

23    A.   That is correct.

24    Q.   And that was Government's Exhibit No. 4.  Did you see

25    the photo?

1      A.   Yes, sir.

2               MR. McDANIEL:   May I approach, Your Honor?

3               THE COURT:   Yes, you may.

4      BY MR. McDANIEL:

5      Q.   Now, sir, before he showed you Government's Exhibit

6      No. 4 had you seen Government's Exhibit No. 4?

7      A.   Before the defendant showed me that, no, I did not.

8      Q.   And when he showed you that -- he showed you that, and

9      then he placed it back; is that right?

10     A.   He picked it up from the center console area.  However,

11     when he set it back down, he put it up, which would be like

12     the radio area of the vehicle.

13     Q.   Now, at that time you had not seen any other contraband,

14     nor the marijuana, nor the firearms, or ammunition; is that

15     right?

16     A.   The only thing witnessed at that time was the marijuana

17     that the defendant showed me.

18     Q.   And it was based upon that -- the marijuana that he had

19     shown you and the traffic violation which resulted in the

20     original stop, driving without the lights, that led to the

21     request for the occupants of the vehicle -- at least the

22     other two occupants of the vehicle -- to get out of the

23     vehicle; is that right?

24     A.   That is correct.

25     Q.   Because you had decided at that time that you were going

```
1    to search the vehicle; is that right?
2    A.  That is correct.
3    Q.  At the time that you searched the vehicle, though, or
4    were beginning to search the vehicle, neither the passenger
5    or the back-seat passenger or Mr. Reynoso had been placed
6    under arrest, correct?
7    A.  That is correct.
8    Q.  So this was not -- what you were beginning was not a
9    search incident to the arrest because nobody had been
10   arrested, right?
11   A.  That is correct.  It was a mere detention.
12           MR. McDANIEL:  Okay.
13           THE COURT:  Did the fact that you smelled
14   marijuana have anything to do with your determination that
15   you were going to search the vehicle?
16           THE WITNESS:  That was a factor that was
17   considered into the -- the overall consideration of the
18   additional search of the vehicle, ma'am.
19   BY MR. McDANIEL:
20   Q.  But you didn't have any reason to believe that there was
21   any other marijuana in the vehicle other than the marijuana
22   that Mr. Reynoso had shown you, right?  Because you're
23   telling us that it was the smell of marijuana and what
24   Mr. Reynoso actually showed you that led to your desire to
25   actually search the vehicle, correct?
```

1    A.   No, sir.

2    Q.   What -- what else was there?

3    A.   I believe that there was additional marijuana in that

4    vehicle.

5    Q.   No.  I -- no, I get that.

6         But in terms of the information that you were

7    operating from -- the information that led to you making the

8    decision, was the marijuana that Mr. Reynoso had shown you,

9    correct?

10   A.   That is -- the marijuana that he showed me, in addition

11   to the odor of marijuana is what led me to make the decision

12   to conduct a probable cause search of the vehicle for

13   additional marijuana.

14   Q.   Understood.  So it was those two factors, right?

15   A.   That is correct.

16   Q.   Okay.  And you and I agree that you never made a request

17   for a search warrant in connection with the search, correct?

18   A.   That is correct.

19   Q.   Now, when the two individuals who were in the vehicle,

20   the passenger side of the vehicle, got out of the car --

21   before they were -- got out of the car, they were asked to

22   get out of the vehicle, correct?

23   A.   That is correct.

24   Q.   Was that you, or was it your partner that asked them to

25   get out of the vehicle?

1    A.   It was other officers.

2    Q.   Other officers that had come to the scene?

3    A.   That is correct.

4    Q.   Okay.  Do you remember who it is that asked them to get

5    out of the vehicle?

6    A.   As in my original testimony, the rear passenger was

7    removed by Officer Agnimel and Officer Dirienzo.  The front

8    passenger was removed by Officer Agnimel and Officer Adorno.

9    Q.   Okay.  Were you able to hear what they were saying to

10   them as they were bringing them out of the vehicle?

11   A.   My overall responsibility was the scene safety.  Whether

12   they were talking to the individuals or not, I don't recall.

13   Q.   Okay.  So it's fair to say you don't know if any of

14   those other officers directed Mr. Reynoso to get out of the

15   vehicle, correct?

16   A.   Those other officers were directing the two passengers

17   of the vehicle.

18   Q.   Understood.  But you couldn't hear what they were

19   saying, right?

20   A.   I could hear what they were saying --

21   Q.   Okay.

22   A.   -- I just don't recall what they said.

23   Q.   And you're certain --

24   A.   At no point in time did those other officers direct

25   Mr. Reynoso to step out.

1    Q.  Okay.  And Mr. Reynoso got out of the vehicle in and

2    around the same time as the other individuals got out of the

3    vehicle, correct?

4    A.  Mr. Reynoso exited the vehicle without being asked as

5    the second passenger, who was in the front seat, was being

6    detained.

7    Q.  So they got out around the same time; is that right?

8    A.  Yes, sir.

9    Q.  Okay.  So the other individual was already out of the

10   vehicle, and then Mr. Reynoso got out; is that right?

11   A.  This whole scenario is as slow as possible to be as safe

12   as possible.  So the first passenger, which was in the rear

13   seat, was removed and detained.

14            Then I directed Officer Agnimel and Officer Adorno

15   to remove the front passenger.

16            This isn't a quick one, two, let's go.  It's a

17   slow, deliberate movement.

18   Q.  All right.  So let me ask a better question.

19            How long, after both of the individuals on the

20   passenger side were out of the vehicle, was it that

21   Mr. Reynoso got out of the car?

22   A.  Approximately a minute.

23   Q.  And when he got out of the vehicle, you were still

24   standing at the vehicle; is that right?

25   A.  I was standing at the driver's side rear corner of the

1    vehicle.

2    Q.  Okay.  And when they were working with the passengers,

3    getting them out of the vehicle from the passenger side,

4    what were you doing?

5    A.  I was observing the entire scene.

6    Q.  Okay.  Mr. Reynoso gets out of the vehicle.  And then is

7    there any additional discussion between you and Mr. Reynoso?

8    A.  When Mr. Reynoso stepped out of the vehicle, I stepped

9    up to him at the driver's side door and requested that he

10    put down his cell phone.

11    Q.  Are you, at that point in time, arm's length from

12    Mr. Reynoso?

13    A.  Yes, sir.

14    Q.  Was the door open?

15    A.  The door was open.

16    Q.  The doors to the passenger side of the vehicle, on both

17    the rear and the -- the front, were they left open after the

18    passengers were taken out of the vehicle?

19    A.  I don't recall, sir.

20    Q.  And you say then, at that point in time, Mr. Reynoso

21    takes flight; is that right?

22    A.  After multiple requests to put down his cell phone --

23    Q.  Uh-huh.

24    A.  -- he walked towards the front of the vehicle.  And when

25    he was at the front driver's side corner of the vehicle,

1     Mr. Reynoso, the defendant, took off at a sprint.

2     Q.  Okay.  And when he took off at a sprint, you chased him?

3     A.  I did not.

4     Q.  You stood -- you stayed with the car?

5     A.  I went over the radio, indicated that we had an

6     individual fleeing on foot.  And I proceeded back to my

7     marked patrol cruiser to pursue the individual with my

8     marked police cruiser.

9     Q.  Okay.  So you got into the vehicle -- your vehicle and

10    started a canvass for him; is that right?

11    A.  That is correct.

12    Q.  Okay.  Now, when you left the -- when you left the

13    vehicle, the BMW vehicle, you had not seen any cartridge

14    casings or any cartridges, right, for any firearm?

15    A.  That is correct.

16    Q.  And you hadn't seen any firearm, correct?

17    A.  That is correct.

18    Q.  And I am going to show you --

19          MR. McDANIEL:  If I could approach, Your Honor?

20          THE COURT:  Yes.

21    BY MR. McDANIEL:

22    Q.  -- Government's Exhibits No. 9 and No. 10.

23          Do you recognize those photos as photos of the

24    interior of the passenger side door; is that right?

25    A.  That is correct.

```
1    Q.  Okay.  I'm going to show you --

2              THE COURT:  Well, do you want to introduce those

3    photographs as --

4              MS. CLARK:  I haven't --

5              THE COURT:  If Officer Biel can identify them as

6    fair and accurate copies, you may as well put them in, and I

7    can see what you're talking about, Mr. McDaniel.

8              MR. McDANIEL:  That would be good, Your Honor.  I

9    thought they were already in.  And so if -- if we could then

10   offer into evidence --

11   BY MR. McDANIEL:

12   Q.  Are these fair and accurate depictions of how that

13   looked on that day?

14   A.  Yes, sir.

15             MR. McDANIEL:  Government's Exhibit 9 and

16   Government's Exhibit 10.

17             THE COURT:  I am sure the Government has no

18   objection, so we'll introduce them for purposes of the

19   hearing.

20             MR. McDANIEL:  Do you mind if I ask a couple more

21   questions while I'm standing here, Your Honor?

22             THE COURT:  Sure.  Absolutely.

23             (Government's Exhibits 9 and 10, admitted.)

24   BY MR. McDANIEL:

25   Q.  And so I'm showing you Government's Exhibit No. 7 and
```

 1    Government's Exhibit No. 1.

 2              MR. McDANIEL:  Is No. 7 in, Your Honor?

 3              MS. CLARK:  No, it's not.

 4              THE COURT:  No, it's not.

 5              MR. McDANIEL:  If we can offer Government's

 6    Exhibit No. 7.

 7              THE COURT:  I am sure there is no objection.

 8    Let's let it in.

 9              MS. CLARK:  No objection.

10              THE COURT:  Admitted.

11              (Government's Exhibit 7, admitted.)

12    BY MR. McDANIEL:

13    Q.  So when you left that location, you can't tell us

14    whether or not the door to the BMW, which is depicted in

15    Government's Exhibit No. 7, was open or closed, correct?

16    A.  That is correct.

17    Q.  Now, in Government Exhibit No. 9, which is the interior

18    door of the -- is that the front passenger side of the

19    vehicle?

20    A.  It's the front passenger door.

21    Q.  Okay.  You see that.  And then there is a shaded area in

22    the middle of the picture, which is some type of holding

23    compartment for the interior of the door; is that right?

24    What would you call that?

25    A.  I call it a map pocket.

1    Q.  A map pocket?

2              THE COURT:  You know, Mr. McDaniel, do you want to

3    put it on the ELMO, or something, so I can see what you are

4    talking about --

5              MR. McDANIEL:  Yes.

6              THE COURT:  -- because I'm sort of the finder of

7    fact here, and I have no idea what you are talking about.

8              MR. McDANIEL:  Sure.

9    BY MR. McDANIEL:

10   Q.  Showing you Government's Exhibit No. 9, we were talking

11   about that map pocket.

12   A.  Yes, sir.

13   Q.  Okay.  Now, the map pocket there is not illuminated; is

14   that right?

15   A.  That is correct.

16   Q.  I am showing you Government's No. 10.  That seems to be

17   the same map pocket but illuminated by something, maybe a

18   flashlight; is that right?

19   A.  It is now illuminated, yes.

20   Q.  Okay.  Did you -- were you present when these photos

21   were being taken?

22   A.  No, sir.

23   Q.  Do you know who took the photos?

24   A.  Crime Scene Technician Zolton.

25   Q.  Were you present when they were being taken?

1   A.   No, I was not.

2   Q.   Okay.  Do you know if any law enforcement officer opened

3   the door before these photos were taken?

4   A.   I do not know, sir.

5   Q.   But, at some point in time, Mr. Reynoso was located,

6   correct?

7   A.   That is correct.

8   Q.   And do you go to the location where Mr. Reynoso was

9   located?

10   A.   Yes, I did.

11   Q.   Okay.  And while you are there at that location where

12   Mr. Reynoso has been -- been captured, if you will, you

13   receive some -- some information over the radio that a

14   search has been conducted and that some additional evidence

15   has been located; is that right?

16   A.   That information was put out a significant time before

17   the defendant was located.

18   Q.   Okay.  So how long, after you left the location looking

19   for Mr. Reynoso in your vehicle, was it that you heard the

20   report over the radio about the recovery of the location of

21   the firearms evidence?

22   A.   The individual officer went over the radio and indicated

23   about five minutes into the canvass for the defendant that

24   there was a loaded magazine in the door pocket.

25            MR. McDANIEL:  Thank you, sir.

1          No further questions, Your Honor.

2          THE COURT:  Any redirect?

3          MS. CLARK:  Very -- very briefly, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MS. CLARK:

6    Q.  Officer Biel, when you turned onto 17th Street, how

7    would you describe the vehicular traffic conditions coming

8    southbound on 17th Street?

9    A.  It was light.

10   Q.  Light.  And about -- do you recall approximately how

11   many vehicles were in front of that BMW?

12   A.  I don't recall.

13   Q.  And do you recall how far the closest vehicle would have

14   been from the BMW when you first saw the BMW did not have

15   its lights on?

16   A.  There was a pack of vehicles in front of the BMW.  The

17   BMW was separated slightly from the other vehicles that were

18   traveling southbound.

19   Q.  And what, if anything, obstructed or blocked your view

20   of the BMW when you were driving on -- northbound on 17th

21   Street?

22   A.  There was no obstructions.

23   Q.  Okay.  And was it pitch black outside that morning?

24   A.  Other than the street lighting, it was pitch black.  It

25   was --

1    Q.   Okay.

2    A.   -- drizzling, so it was very cloudy.

3    Q.   Okay.  Did you have any problems seeing the BMW being

4    operated without headlights that morning?

5    A.   No, I did not.

6              MS. CLARK:  No further questions.

7              THE COURT:  Officer, you are excused.

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Thank you.

10             Ms. Clark, do you want to call your next witness?

11             MS. CLARK:  The Government calls to the stand --

12             THE COURT:  Okay.  Just a second.

13             (Whereupon, the Court and staff confer.)

14             THE COURT:  We're going to have to get a

15    replacement court reporter, so we are going to take a

16    ten-minute break.

17             MS. CLARK:  I do not expect the next witness to be

18    as lengthy, very short.

19             THE COURT:  Okay.

20             (Whereupon, a recess was taken.)

21             (Whereupon, the remainder of the hearing was

22    reported by Timothy Miller and placed under separate cover.)

23                         * * * * *

24

25

**INDEX**

**GOVERNMENT WITNESS:**

**Scott Biel** .......................25, 55, 77


**GOVERNMENT EXHIBITS, Admitted**

Exhibit 1                          33
Exhibit 2                          40
Exhibit 3                          42
Exhibit 4                          44
Exhibit 5                          52
Exhibit 6                          54
Exhibit 7                          74
Exhibit 9                          73
Exhibit 10                         73


                        *  *  *  *  *




**CERTIFICATE**


        I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

certify that the foregoing constitutes a true and accurate

transcript of my stenographic notes, and is a full, true,

and complete transcript of the proceedings to the best of my

ability.


        Dated this 3rd day of January, 2019.


        /s/ Elizabeth Saint-Loth, RPR, FCRR
        Official Court Reporter

## $

**$1,000** [1] - 5:3
**$1,647** [1] - 18:18
**$2,500** [1] - 5:8
**$2,680** [1] - 50:22
**$205** [1] - 55:7
**$250,000** [1] - 4:4
**$5,000** [1] - 5:12

## /

**/s** [1] - 79:24

## 0

**06** [1] - 27:25

## 1

**1** [24] - 3:11, 7:13,
32:21, 32:25, 33:11,
33:16, 37:22, 38:1,
38:6, 38:9, 38:11,
38:15, 38:17, 41:4,
41:23, 41:24, 42:25,
44:1, 44:16, 51:22,
55:2, 65:21, 74:1,
79:6
**10** [5] - 72:22, 73:16,
73:23, 75:16, 79:10
**10:00** [2] - 27:24, 56:6
**11** [1] - 25:25
**12th** [3] - 7:12, 8:13,
9:5
**15** [1] - 5:7
**15th** [2] - 27:24, 28:2
**16** [1] - 1:6
**16th** [11] - 14:1, 21:15,
21:23, 27:20, 27:25,
28:3, 29:6, 29:9,
33:7, 40:17, 60:21
**17th** [19] - 29:12,
29:17, 29:21, 29:22,
30:7, 30:15, 31:3,
48:4, 48:7, 49:5,
51:5, 56:11, 56:25,
57:3, 57:13, 57:18,
77:6, 77:8, 77:20
**18** [1] - 3:14
**18-253** [2] - 1:4, 2:5
**19** [2] - 7:20, 7:21
**1920** [1] - 1:17
**1988** [2] - 19:17, 21:1
**1990** [1] - 20:12
**1998** [1] - 22:9
**1:19** [2] - 29:9, 56:7

## 2

**2** [10] - 3:15, 7:15,
40:8, 40:11, 40:13,
40:20, 40:24, 40:25,
41:14, 79:6
**20** [1] - 51:20
**2000** [1] - 19:13
**20001** [1] - 1:22
**20001-2733** [1] - 1:14
**2001** [1] - 21:1
**2002** [1] - 22:19
**20036** [1] - 1:18
**2006** [1] - 5:21
**2007** [1] - 21:2
**2008** [2] - 18:2, 20:20
**2010** [1] - 5:21
**2011** [1] - 5:19
**2012** [1] - 20:13
**2017** [9] - 13:25,
17:20, 17:25, 21:5,
21:12, 21:21, 23:9,
23:19, 23:24
**2018** [13] - 1:6, 7:12,
21:15, 21:23, 23:25,
26:17, 27:20, 28:2,
28:3, 29:6, 29:9,
33:7, 40:17
**2019** [1] - 79:23
**202)252-7740** [1] -
1:15
**202)875-8361** [1] -
1:19
**205** [1] - 55:1
**21** [1] - 3:17
**212** [2] - 18:12, 22:22
**22** [2] - 6:7, 6:12
**22-round** [1] - 51:19
**23** [2] - 18:15, 21:10
**25** [1] - 79:3
**27** [2] - 21:13, 51:19
**28** [1] - 17:20
**28th** [5] - 13:25, 17:25,
21:5, 21:12, 21:21
**2:59** [1] - 1:5
**2K2.1(a)(3)** [1] - 6:7
**2nd** [1] - 24:17

## 3

**3** [11] - 3:18, 7:15,
42:6, 42:8, 42:10,
42:17, 42:21, 42:22,
43:4, 43:10, 79:7
**303** [1] - 1:18
**33** [1] - 79:6
**3553(a** [1] - 7:19
**37** [1] - 7:22

**3rd** [1] - 79:23

## 4

**4** [9] - 43:19, 43:22,
43:24, 44:5, 44:10,
65:24, 66:6, 79:7
**40** [5] - 18:15, 21:11,
21:13, 51:17, 79:6
**403** [7] - 12:17, 15:19,
20:5, 20:10, 20:15,
23:3, 24:1
**404(3** [1] - 13:7
**404(b** [17] - 10:3, 10:6,
11:5, 12:25, 13:3,
13:15, 15:2, 15:14,
16:14, 16:19, 18:23,
19:8, 19:15, 19:18,
20:3, 20:9
**404(b)** [3] - 14:16,
16:5, 24:1
**404(b)(1)** [1] - 19:2
**404(b)(2)** [1] - 19:6
**42** [1] - 79:7
**44** [1] - 79:7
**46** [1] - 7:22
**4th** [1] - 1:14

## 5

**5** [6] - 52:4, 52:6, 52:8,
52:16, 52:21, 79:8
**51** [1] - 6:13
**52** [1] - 79:8
**54** [1] - 79:8
**55** [1] - 79:3
**555** [1] - 1:14

## 6

**6** [7] - 53:5, 53:8,
53:10, 54:2, 54:7,
60:21, 79:8
**63** [1] - 6:14

## 7

**7** [6] - 73:25, 74:2,
74:6, 74:11, 74:15,
79:9
**73** [2] - 79:9, 79:10
**74** [1] - 79:9
**77** [1] - 79:3

## 8

**844(a** [2] - 4:11, 4:24

**844(a)** [1] - 3:17
**851** [1] - 4:9
**8:00** [1] - 18:1

## 9

**9** [7] - 24:9, 72:22,
73:15, 73:23, 74:17,
75:10, 79:9
**90** [1] - 5:10
**90-day** [1] - 5:11
**922(g** [2] - 4:1, 7:14
**922(g)(1)** [1] - 3:14

## A

**A-G-N-I-M-A-L** [1] -
29:2
**a.m** [1] - 27:25
**ability** [1] - 79:21
**able** [7] - 6:5, 57:11,
57:14, 57:20, 57:25,
63:11, 69:9
**absence** [2] - 19:5,
21:9
**absolutely** [3] - 12:14,
13:12, 73:22
**accept** [1] - 9:11
**acceptable** [1] - 16:19
**acceptance** [2] - 6:11,
7:17
**access** [1] - 17:2
**accident** [1] - 19:6
**accidentally** [1] - 23:7
**accord** [1] - 24:5
**accordance** [1] - 19:1
**according** [2] - 6:4,
7:16
**accurate** [10] - 9:9,
33:4, 40:16, 42:13,
44:2, 52:13, 53:23,
73:6, 73:12, 79:18
**act** [2] - 13:17, 18:24
**acted** [1] - 19:1
**Action** [1] - 1:3
**actions** [1] - 19:12
**activate** [1] - 58:20
**activated** [5] - 30:12,
30:18, 30:23, 58:17,
58:23
**actor's** [2] - 19:20,
19:25
**acts** [2] - 19:19, 19:23
**actual** [1] - 64:6
**add** [2] - 10:9, 10:11
**addition** [1] - 68:10
**additional** [11] - 45:1,
49:8, 55:1, 57:5,

57:7, 59:8, 67:18,
68:3, 68:13, 71:7,
76:14
**adhere** [1] - 47:15
**admissibility** [1] -
20:14
**admissible** [4] -
18:24, 19:3, 20:3,
23:25
**admission** [2] - 11:17,
19:10
**admit** [4] - 12:12,
21:7, 23:4, 24:2
**admitted** [16] - 21:6,
24:4, 33:16, 40:24,
40:25, 42:17, 42:22,
44:9, 44:10, 52:20,
52:21, 54:6, 54:7,
73:23, 74:10, 74:11
**Admitted** [1] - 79:5
**Adorno** [3] - 45:17,
69:8, 70:14
**advancing** [1] - 15:12
**advantage** [1] - 35:11
**adversely** [1] - 19:20
**advised** [2] - 9:19,
9:20
**affect** [1] - 11:3
**afternoon** [10] - 2:9,
2:14, 2:18, 2:19,
25:2, 25:7, 25:8,
25:13, 55:13, 55:14
**agencies** [1] - 48:24
**Agnimel** [7] - 28:21,
45:12, 45:17, 56:3,
69:7, 69:8, 70:14
**agree** [3] - 7:16,
63:25, 68:16
**agreed** [6] - 7:6, 7:9,
7:14, 7:23, 8:5, 8:7
**agreement** [6] - 7:10,
7:23, 9:8, 9:11, 51:2
**aided** [2] - 1:25, 15:20
**allege** [1] - 16:25
**allegedly** [1] - 18:6
**allocution** [1] - 7:23
**allow** [2] - 17:8
**allowance** [1] - 15:13
**allowed** [1] - 51:4
**almost** [1] - 12:16
**alone** [1] - 13:2
**alternate** [1] - 26:15
**alternatives** [1] -
11:23
**Amaturo** [2] - 45:5,
49:17
**America** [2] - 2:3, 2:5
**AMERICA** [1] - 1:3
**ammunition** [6] - 3:12,
21:11, 21:14, 51:18,

51:20, 66:14
**amount** [5] - 5:8, 37:22, 38:13, 43:25, 50:22
**analysis** [3] - 17:7, 20:4, 20:8
**apologize** [1] - 6:18
**apparent** [2] - 23:10, 41:24
**appear** [1] - 64:14
**APPEARANCES** [1] - 1:11
**appeared** [2] - 38:8, 44:17
**applicable** [1] - 16:9
**approach** [15] - 31:17, 32:5, 32:16, 40:3, 41:6, 42:1, 43:6, 43:15, 51:24, 52:25, 59:5, 61:2, 61:11, 66:2, 72:19
**approached** [10] - 18:4, 31:7, 31:16, 31:18, 34:1, 35:1, 37:13, 59:2, 59:14, 61:15
**approaching** [7] - 34:23, 35:5, 59:18, 59:21, 59:23, 61:13, 62:6
**appropriate** [2] - 3:3, 8:1
**area** [19] - 31:9, 38:16, 40:14, 40:15, 41:2, 41:3, 41:10, 41:25, 42:25, 43:2, 49:3, 49:5, 49:7, 51:22, 51:23, 57:23, 66:10, 66:12, 74:21
**arguably** [2] - 11:20, 17:2
**argues** [1] - 23:17
**argument** [5] - 13:8, 13:24, 14:4, 15:5, 15:13
**arm's** [4] - 14:2, 22:5, 36:6, 71:11
**armed** [1] - 49:21
**arrest** [5] - 17:19, 18:18, 21:5, 67:6, 67:9
**arrested** [1] - 67:10
**article** [1] - 35:23
**artificial** [1] - 29:16
**ascertaining** [1] - 20:1
**ash** [1] - 64:14
**ashes** [1] - 64:23
**ashtray** [1] - 64:13
**aside** [1] - 15:10
**assigned** [10] - 26:4,

26:5, 26:8, 26:9, 26:10, 26:12, 26:18, 26:20, 28:12, 28:14
**assignment** [1] - 26:3
**assist** [2] - 48:24, 49:2
**attempt** [1] - 21:17
**attention** [3] - 27:19, 29:8, 29:21
**attorney's** [1] - 7:5
**Attorney's** [2] - 1:13, 7:8
**automatic** [3] - 18:15, 21:11, 21:14
**Avenue** [1] - 29:12, 30:16, 31:5, 48:9, 50:1
**average** [1] - 58:19
**avoid** [1] - 16:6
**awaiting** [1] - 18:22
**aware** [3] - 8:17, 15:15, 63:19

## B

**B-I-E-L** [1] - 25:15
**back-seat** [1] - 67:5
**backpack** [3] - 18:9, 18:11, 22:23
**bad** [1] - 21:18
**balance** [1] - 14:11
**balancing** [1] - 13:7
**banc** [1] - 22:10
**bar** [1] - 20:15
**barrier** [1] - 13:18
**base** [3] - 6:6, 6:10, 6:12
**based** [7] - 10:24, 17:22, 36:14, 61:14, 64:4, 66:18
**Basin** [1] - 50:1
**basis** [2] - 17:20, 20:5
**bears** [1] - 19:21
**beast** [1] - 15:17
**beat** [1] - 28:13
**BEFORE** [1] - 1:9
**begin** [1] - 2:20
**beginning** [2] - 67:4, 67:8
**behalf** [2] - 2:10, 2:15
**behind** [5] - 31:11, 34:19, 35:24, 57:8, 58:16
**belonged** [2] - 39:25, 40:1
**BERYL** [1] - 1:9
**best** [3] - 14:20, 17:10, 79:20
**better** [1] - 70:18
**between** [5] - 23:15,

35:6, 59:9, 63:19, 71:7
**Biel** [20] - 25:5, 25:15, 27:19, 29:8, 32:23, 34:1, 35:20, 40:7, 41:2, 41:22, 42:5, 42:24, 43:18, 52:3, 53:4, 54:18, 55:13, 73:5, 77:6, 79:3
**BIEL** [1] - 25:6
**bike** [1] - 28:13
**bill** [16] - 37:23, 38:1, 38:6, 38:9, 38:11, 38:15, 38:17, 41:4, 41:23, 41:24, 42:25, 44:1, 44:16, 51:22, 55:2, 65:21
**bkmassociates@aol.
com** [1] - 1:19
**black** [6] - 18:14, 29:22, 48:21, 64:23, 77:23, 77:24
**blocked** [1] - 77:19
**blocks** [2] - 30:1, 57:19
**blue** [1] - 18:2
**blunt** [1] - 64:23
**blunts** [1] - 64:23
**BMW** [63] - 18:2, 18:3, 18:4, 18:9, 18:11, 21:11, 21:15, 21:23, 22:2, 29:22, 29:24, 29:25, 30:2, 30:8, 31:1, 31:4, 31:6, 31:9, 31:11, 31:17, 31:19, 31:23, 31:25, 33:6, 34:1, 34:10, 34:12, 35:5, 35:13, 35:21, 36:4, 36:5, 37:13, 46:21, 47:6, 47:8, 47:11, 50:24, 51:16, 56:8, 56:10, 56:18, 56:21, 57:4, 57:7, 57:8, 57:10, 57:11, 57:14, 57:17, 58:17, 58:24, 59:17, 59:21, 72:13, 74:14, 77:11, 77:14, 77:16, 77:17, 77:20, 78:3
**body** [1] - 65:14
**body-worn** [1] - 65:14
**bound** [2] - 7:9
**Bowie** [3] - 19:13, 19:14, 20:7
**branch** [3] - 26:10, 26:12, 26:19
**break** [1] - 78:16
**BRIAN** [1] - 1:17
**Brian** [1] - 2:15
**Bridge** [1] - 50:7

**brief** [2] - 2:11, 64:17
**briefly** [3] - 3:25, 26:16, 77:3
**bring** [1] - 7:20
**bringing** [1] - 69:10
**brought** [1] - 54:22
**bud** [3] - 38:8, 38:9, 44:17
**building** [1] - 45:14
**burned** [2] - 64:7, 64:10
**burnt** [3] - 63:20, 63:22, 64:22
**BY** [32] - 25:12, 28:25, 29:5, 32:22, 33:25, 36:3, 38:20, 39:19, 40:6, 41:1, 41:8, 41:21, 42:4, 42:23, 43:17, 44:14, 46:15, 52:2, 53:3, 53:22, 54:17, 55:12, 64:21, 65:13, 66:4, 67:19, 72:21, 73:11, 73:24, 74:12, 75:9, 77:5

## C

**calculate** [1] - 5:25
**calculated** [1] - 5:24
**caliber** [4] - 18:15, 21:11, 21:13, 51:18
**cam** [1] - 65:4
**camera** [1] - 65:14
**cams** [1] - 65:7
**cannot** [1] - 11:21
**canvas** [1] - 49:10
**canvass** [2] - 72:10, 76:23
**capacity** [1] - 6:8
**captured** [1] - 76:12
**car** [20] - 28:12, 29:6, 30:18, 30:24, 32:1, 35:8, 36:15, 36:20, 36:21, 44:19, 47:24, 58:10, 59:9, 61:2, 63:8, 63:9, 68:20, 68:21, 70:21, 72:4
**car's** [1] - 18:14
**care** [1] - 36:25
**career** [4] - 27:3, 27:7, 27:11, 27:16
**careful** [1] - 14:14
**cars** [1] - 57:2
**cartridge** [1] - 72:13
**cartridges** [2] - 18:16, 72:14
**case** [39] - 2:24, 3:5, 4:7, 4:14, 5:23, 6:3, 6:21, 7:13, 13:3,

13:20, 14:1, 15:2, 15:9, 15:24, 16:23, 16:25, 17:1, 17:24, 18:3, 18:20, 19:13, 19:14, 19:17, 19:21, 20:12, 20:20, 20:25, 21:1, 21:2, 21:15, 22:9, 22:19, 23:4, 23:12, 23:13, 24:19, 65:1
**Case** [1] - 2:4
**cases** [3] - 16:12, 20:21, 22:15
**cash** [3] - 50:18, 50:20, 55:9
**casings** [1] - 72:14
**Cassell** [1] - 22:19
**Category** [2] - 6:1, 6:13
**category** [1] - 15:11
**caught** [1] - 29:20
**cell** [7] - 47:9, 47:12, 47:16, 47:17, 50:19, 71:10, 71:22
**center** [12] - 17:1, 18:14, 22:1, 38:10, 38:16, 40:15, 41:3, 41:25, 51:22, 51:23, 52:10, 66:10
**certain** [1] - 69:23
**certainly** [3] - 12:13, 16:20, 17:4
**CERTIFICATE** [1] - 79:15
**certification** [1] - 20:8
**certify** [1] - 79:18
**chamber** [1] - 18:16
**change** [2] - 9:13, 49:18
**character** [7] - 16:3, 16:8, 18:25, 19:1, 19:12, 19:20, 21:18
**charge** [6] - 4:1, 4:2, 6:6, 6:20, 7:14, 22:23
**charged** [10] - 3:5, 3:15, 17:24, 20:21, 20:25, 21:15, 22:15, 22:19, 22:25, 23:22
**charges** [4] - 3:10, 10:4, 17:20, 23:8
**chased** [1] - 72:2
**check** [3] - 30:19, 31:7, 44:21
**CHIEF** [1] - 1:10
**circle** [2] - 41:10, 43:1
**Circuit** [13] - 5:23, 13:3, 19:7, 19:13, 20:11, 20:12, 20:20, 20:25, 21:2, 22:9,

82

22:10, 22:15, 22:19
**circumstance** [1] - 19:11
**circumstances** [1] - 16:1
**city** [2] - 26:24, 29:19
**Clark** [7] - 2:10, 3:6, 10:8, 17:9, 24:10, 43:14, 78:10
**CLARK** [86] - 1:12, 2:9, 3:9, 3:24, 4:15, 5:15, 7:1, 7:5, 7:21, 8:14, 8:16, 8:24, 10:10, 12:4, 12:6, 12:9, 12:14, 17:15, 24:12, 24:15, 25:4, 25:9, 25:12, 28:24, 28:25, 29:3, 29:5, 32:5, 32:7, 32:12, 32:14, 32:16, 32:19, 32:22, 33:9, 33:17, 33:20, 33:24, 33:25, 35:25, 36:3, 38:20, 39:19, 40:3, 40:6, 40:19, 41:1, 41:6, 41:8, 41:12, 41:18, 41:21, 42:1, 42:4, 42:16, 42:23, 43:6, 43:9, 43:12, 43:15, 43:17, 44:4, 44:11, 44:14, 46:15, 51:24, 52:2, 52:15, 52:22, 52:25, 53:3, 53:20, 53:22, 54:1, 54:14, 54:17, 55:4, 65:9, 73:4, 74:3, 74:9, 77:3, 77:5, 78:6, 78:11, 78:17
**Clark's** [1] - 9:7
**clear** [1] - 30:10
**cleverly** [1] - 14:1
**close** [1] - 36:7
**closed** [1] - 74:15
**closely** [1] - 17:9
**closest** [1] - 77:13
**closing** [1] - 13:16
**clothes** [1] - 48:22
**clothing** [1] - 35:23
**cloudy** [1] - 78:2
**Code** [2] - 3:14, 3:17
**cognizant** [1] - 20:15
**colloquy** [4] - 2:22, 10:18, 11:1, 11:20
**color** [1] - 33:22
**colored** [1] - 24:22
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 1:13
**coming** [3] - 5:19, 5:20, 77:7
**commit** [1] - 23:18

**common** [2] - 16:8, 16:9
**communicated** [2] - 8:12, 9:4
**compartment** [1] - 74:23
**complete** [2] - 54:23, 79:20
**completed** [1] - 58:21
**completing** [1] - 58:23
**complies** [2] - 41:11, 43:5
**comply** [1] - 47:20
**component** [1] - 15:5
**computer** [2] - 1:25, 61:21
**computer-aided** [1] - 1:25
**concern** [1] - 23:14
**concurrent** [3] - 7:3, 7:7, 8:8
**conditions** [6] - 29:14, 29:16, 31:8, 31:10, 34:7, 77:7
**conduct** [9] - 17:19, 20:2, 21:4, 21:8, 23:16, 23:24, 30:14, 44:25, 68:12
**conducted** [9] - 30:11, 30:12, 30:15, 30:25, 33:3, 36:13, 47:6, 54:20, 76:14
**confer** [1] - 78:13
**conference** [1] - 2:22
**conferred** [1] - 12:1
**conformed** [1] - 19:12
**connection** [1] - 68:17
**consider** [1] - 20:4
**consideration** [1] - 67:17
**considered** [1] - 67:17
**consistent** [1] - 18:5
**console** [11] - 17:2, 18:14, 22:2, 38:10, 38:16, 40:15, 41:3, 51:22, 51:23, 52:10, 66:10
**constitutes** [1] - 79:18
**Constitution** [6] - 29:11, 30:16, 31:5, 48:9, 49:5, 51:5
**constructive** [3] - 21:10, 23:5, 23:21
**constructively** [2] - 21:13, 21:22
**contact** [2] - 36:9, 61:2
**contacted** [1] - 49:1
**contained** [1] - 55:3
**containing** [1] - 18:12

**contention** [1] - 11:19
**contingent** [1] - 4:25
**continue** [3] - 20:4, 29:3, 39:20
**contraband** [3] - 14:10, 23:6, 66:13
**contrary** [1] - 21:19
**control** [1] - 21:25
**controlled** [3] - 3:16, 3:19, 5:20
**conversation** [1] - 36:18
**convicted** [3] - 3:4, 3:12, 3:23
**conviction** [4] - 5:4, 6:3, 8:11, 18:22
**convictions** [4] - 4:25, 5:9, 5:16, 5:18
**cool** [1] - 60:23
**copies** [3] - 24:23, 24:25, 73:6
**copy** [5] - 24:22, 33:22, 39:2, 53:23, 61:9
**corner** [4] - 46:25, 48:1, 70:25, 71:25
**correct** [47] - 5:17, 9:24, 54:12, 56:1, 56:9, 56:12, 56:20, 57:24, 58:15, 59:1, 59:4, 59:12, 59:16, 60:20, 60:22, 62:5, 62:19, 63:4, 64:3, 64:8, 64:9, 65:23, 66:24, 67:2, 67:6, 67:7, 67:11, 67:25, 68:9, 68:15, 68:17, 68:18, 68:22, 68:23, 69:3, 69:15, 70:3, 72:11, 72:15, 72:16, 72:17, 72:25, 74:15, 74:16, 75:15, 76:6, 76:7
**correction** [2] - 10:10, 11:2
**correctly** [1] - 5:24
**counsel** [7] - 2:7, 2:16, 8:13, 9:15, 9:22, 11:13, 41:15
**Count** [4] - 3:11, 3:15, 3:18, 7:13
**count** [2] - 3:11, 3:18
**Counter** [1] - 26:10
**Counts** [1] - 7:15
**counts** [1] - 6:18
**County** [4] - 15:24, 17:21, 18:1, 21:5
**couple** [4] - 11:10, 24:12, 26:7, 73:20
**course** [10] - 2:13,

7:18, 7:24, 27:3, 27:7, 27:11, 27:15, 43:8, 53:2, 64:18
**COURT** [96] - 1:1, 1:10, 2:13, 2:18, 3:23, 4:13, 5:13, 6:23, 7:3, 7:20, 8:12, 8:15, 8:22, 9:3, 9:23, 10:1, 12:1, 12:5, 12:8, 12:12, 14:23, 16:13, 17:11, 17:13, 17:17, 24:14, 25:3, 25:7, 25:10, 28:23, 29:4, 32:6, 32:9, 32:13, 32:15, 32:18, 33:12, 33:14, 33:19, 33:23, 36:2, 38:19, 39:15, 39:18, 40:5, 40:21, 40:23, 41:7, 41:16, 41:20, 42:3, 42:18, 42:20, 43:8, 43:14, 43:16, 44:6, 44:8, 44:13, 46:3, 46:11, 46:14, 52:1, 52:17, 52:19, 52:24, 53:2, 54:3, 54:5, 54:10, 54:13, 54:16, 55:6, 55:10, 64:10, 64:16, 64:18, 65:12, 66:3, 67:13, 72:20, 73:2, 73:5, 73:17, 73:22, 74:4, 74:7, 74:10, 75:2, 75:6, 77:2, 78:7, 78:9, 78:12, 78:14, 78:19
**court** [6] - 9:20, 13:19, 19:14, 36:1, 39:22, 78:15
**Court** [50] - 1:21, 1:22, 2:2, 2:4, 2:15, 3:24, 4:7, 5:23, 6:18, 8:16, 9:9, 9:12, 10:24, 11:2, 11:4, 11:9, 11:21, 13:6, 13:12, 13:13, 13:15, 13:20, 14:11, 14:18, 15:18, 15:20, 17:8, 19:14, 19:17, 20:4, 20:15, 20:18, 21:1, 23:23, 24:6, 24:24, 25:14, 33:21, 38:5, 41:18, 43:12, 44:12, 52:23, 54:15, 60:23, 78:13, 79:25
**court's** [1] - 64:17
**Court's** [6] - 3:25, 12:7, 12:23, 13:21, 16:20, 17:4
**courtroom** [2] - 35:20, 35:23

**cover** [1] - 78:22
**Crime** [5] - 26:4, 26:5, 26:8, 51:17, 75:24
**crime** [9] - 3:12, 18:24, 20:25, 22:19, 22:25, 23:19, 51:8, 51:11, 51:14
**crimes** [2] - 3:4, 19:10
**Criminal** [4] - 1:3, 2:4, 6:1, 6:12
**criminal** [6] - 5:25, 17:19, 17:20, 21:4, 21:7, 23:24
**critical** [1] - 19:23
**CROSS** [1] - 55:11
**CROSS-EXAMINATION** [1] - 55:11
**Crowder** [2] - 22:9, 22:11
**cruiser** [6] - 26:20, 28:14, 55:21, 55:22, 72:7, 72:8
**crystal** [2] - 55:3, 55:6
**crystal-like** [1] - 55:3
**cuff** [1] - 46:12
**cuffed** [2] - 46:16
**cumulative** [1] - 20:6
**curb** [2] - 31:2, 45:14
**current** [4] - 22:25, 26:1, 26:3, 63:2

# D

**D-1** [1] - 51:3
**D.C** [15] - 1:6, 1:14, 1:18, 1:22, 19:7, 19:13, 20:11, 20:20, 20:25, 21:2, 22:9, 22:14, 22:19, 26:22, 26:25
**danger** [2] - 20:17, 20:19
**dark** [3] - 29:15, 31:25, 48:22
**dash** [4] - 36:19, 41:25, 65:4, 65:7
**date** [3] - 4:17, 23:22, 53:17
**Dated** [1] - 79:23
**days** [2] - 5:7, 5:10
**DDC** [1] - 20:12
**decide** [1] - 51:6
**decided** [1] - 66:25
**decision** [3] - 44:24, 68:8, 68:11
**DEE** [1] - 1:12
**Dee** [1] - 2:10
**Dee.Clark@usdoj.**

**gov** [1] - 1:15
**deem** [4] - 8:1, 9:1,
  12:16, 13:7
**defendant** [96] - 3:10,
  3:15, 4:8, 5:4, 7:10,
  8:25, 10:17, 10:20,
  10:25, 11:13, 11:15,
  14:10, 18:1, 18:3,
  18:6, 18:10, 18:17,
  20:21, 21:16, 21:17,
  21:24, 22:15, 22:20,
  23:7, 23:17, 35:24,
  36:1, 36:9, 36:11,
  36:13, 36:16, 36:20,
  37:3, 37:6, 37:8,
  37:18, 37:20, 38:1,
  38:6, 38:9, 38:14,
  38:23, 38:24, 39:5,
  39:6, 39:11, 39:24,
  40:1, 41:3, 41:23,
  42:25, 44:1, 44:21,
  45:19, 45:21, 45:23,
  45:25, 46:21, 46:22,
  47:1, 47:2, 47:7,
  47:9, 47:10, 47:12,
  47:13, 47:15, 47:22,
  47:23, 48:1, 48:2,
  48:3, 48:8, 48:10,
  48:24, 49:9, 49:11,
  49:22, 50:11, 50:14,
  50:17, 50:21, 51:3,
  52:12, 53:12, 53:17,
  54:11, 54:18, 54:21,
  54:24, 66:7, 66:17,
  72:1, 76:17, 76:23
**Defendant** [1] - 1:6
**DEFENDANT** [2] -
  1:17, 9:25
**defendant's** [11] -
  11:18, 11:19, 17:19,
  18:19, 21:4, 21:8,
  21:10, 21:19, 23:20,
  24:8, 44:15
**defendants** [1] - 51:10
**defense** [6] - 7:25,
  10:3, 11:20, 13:2,
  24:21, 41:15
**definitely** [1] - 14:19
**deflect** [1] - 14:8
**deliberate** [1] - 70:17
**depicted** [1] - 74:14
**depictions** [1] - 73:12
**DEPUTY** [1] - 2:2
**describe** [2] - 38:5,
  77:7
**described** [1] - 55:18
**description** [3] -
  48:15, 48:18, 48:20
**desire** [1] - 67:24
**detained** [7] - 45:13,

45:24, 46:12, 50:4,
  50:16, 70:6, 70:13
**detention** [3] - 51:3,
  54:11, 67:11
**determination** [4] -
  15:20, 16:7, 61:21,
  67:14
**determining** [1] - 16:2
**different** [5] - 4:10,
  8:10, 8:11, 16:24,
  23:15
**dim** [3] - 29:19, 31:10,
  57:23
**DIRECT** [1] - 25:11
**direct** [4] - 27:19,
  29:8, 44:22, 69:24
**directed** [3] - 45:2,
  69:14, 70:14
**directing** [1] - 69:16
**direction** [5] - 45:10,
  48:3, 48:4, 56:19,
  57:17
**Dirienzo** [2] - 45:12,
  69:7
**discretion** [1] - 20:18
**discussing** [1] - 55:16
**discussion** [1] - 71:7
**discussions** [1] - 8:18
**dismiss** [1] - 7:15
**displaying** [1] - 38:13
**dispute** [1] - 11:22
**disputed** [1] - 19:24
**distance** [2] - 36:5,
  59:9
**distinction** [1] - 63:19
**distribute** [3] - 5:18,
  18:20, 22:21
**distribution** [1] - 5:19
**DISTRICT** [3] - 1:1,
  1:1, 1:10
**district** [2] - 54:20,
  54:21
**District** [1] - 1:13
**division** [1] - 26:19
**docketed** [1] - 24:9
**document** [1] - 53:6
**documentation** [2] -
  61:5, 61:6
**documents** [1] - 63:5
**dollar** [1] - 65:21
**dollars** [1] - 55:1
**dominion** [1] - 21:25
**done** [7] - 12:4, 13:23,
  32:24, 40:10, 42:7,
  43:21, 53:7
**door** [14] - 47:3, 47:23,
  49:12, 51:19, 71:9,
  71:14, 71:15, 72:24,
  74:14, 74:18, 74:20,
  74:23, 76:3, 76:24

**doors** [1] - 71:16
**double** [1] - 13:17
**Douglas** [1] - 21:2
**down** [16] - 35:15,
  35:16, 46:3, 47:12,
  47:15, 47:18, 60:7,
  60:8, 60:11, 60:13,
  60:15, 60:17, 60:19,
  66:11, 71:10, 71:22
**drawing** [1] - 20:2
**dressed** [1] - 28:1
**Drive** [1] - 50:1
**drive** [1] - 29:13
**driver** [8] - 17:3,
  34:17, 35:12, 39:23,
  50:11, 61:3, 62:8,
  64:5
**driver's** [25] - 18:2,
  22:3, 31:18, 34:17,
  35:9, 35:15, 35:16,
  36:7, 37:6, 37:7,
  37:14, 38:21, 40:14,
  45:21, 46:25, 47:2,
  51:20, 59:3, 59:6,
  60:10, 60:11, 61:9,
  70:25, 71:9, 71:25
**driving** [14] - 6:21,
  18:3, 29:7, 29:11,
  29:22, 30:2, 35:21,
  52:12, 53:12, 55:15,
  56:22, 65:3, 66:20,
  77:20
**drizzle** [1] - 61:1
**drizzling** [1] - 78:2
**drove** [2] - 28:22, 29:6
**drug** [3] - 5:5, 5:10,
  6:9
**drugs** [1] - 23:12
**due** [1] - 34:7
**DUI** [1] - 5:20
**during** [5] - 27:3, 27:7,
  27:11, 27:15, 54:25
**duties** [1] - 26:17
**duty** [1] - 56:4

### E

**early** [3] - 27:20, 28:2,
  28:11
**easier** [2] - 4:21, 17:2
**East** [1] - 50:1
**east** [1] - 50:7
**ECF** [1] - 24:9
**eight** [1] - 18:16
**either** [2] - 33:21, 57:3
**element** [3] - 22:8,
  22:12, 22:13
**elicit** [1] - 17:10
**eliminate** [1] - 12:16

**ELIZABETH** [1] -
  79:17
**Elizabeth** [2] - 1:21,
  79:24
**ELMO** [1] - 75:3
**Email** [2] - 1:15, 1:19
**emanating** [1] - 37:11
**emergency** [4] -
  28:17, 30:12, 30:18,
  30:24
**employed** [3] - 25:16,
  25:18, 25:21
**en** [1] - 22:10
**end** [2] - 7:24, 38:11
**enforcement** [7] -
  27:1, 27:3, 27:7,
  27:11, 27:15, 48:23,
  76:2
**engaging** [1] - 62:8
**enhancement** [3] -
  4:9, 4:13, 4:25
**enhancements** [1] -
  4:15
**ensure** [1] - 36:24
**entire** [2] - 26:24, 71:5
**entirety** [1] - 64:4
**entitled** [1] - 7:18
**entry** [1] - 10:25
**envelope** [1] - 55:2
**episode** [1] - 22:4
**equipment** [4] - 28:17,
  30:12, 30:18, 30:24
**ES2** [1] - 6:17
**especially** [1] - 19:25
**establish** [2] - 11:12,
  21:21
**establishment** [1] -
  19:24
**estimate** [1] - 7:21
**estimated** [1] - 6:13
**evaluating** [1] - 20:14
**evening** [5] - 55:15,
  55:24, 56:5, 60:24,
  65:14
**events** [1] - 23:9
**Evidence** [3] - 18:23,
  19:2, 24:1
**evidence** [57] - 10:3,
  10:4, 10:6, 11:4,
  11:25, 12:12, 12:25,
  13:4, 13:15, 13:22,
  15:2, 15:4, 15:14,
  16:14, 17:8, 17:9,
  17:18, 17:22, 18:23,
  19:2, 19:10, 19:18,
  19:19, 19:21, 19:23,
  20:3, 20:5, 20:6,
  20:14, 20:16, 20:18,
  20:22, 21:3, 21:16,
  21:19, 22:11, 22:16,

23:2, 23:4, 23:10,
  23:11, 23:24, 24:2,
  24:4, 24:5, 24:8,
  33:10, 33:15, 40:20,
  42:17, 44:5, 52:16,
  54:2, 73:10, 76:14,
  76:21
**evidence's** [1] - 20:19
**evidentiary** [2] - 2:21,
  10:6
**EXAMINATION** [3] -
  25:11, 55:11, 77:4
**exceeding** [1] - 3:13
**exclude** [1] - 20:18
**excluded** [1] - 20:5
**exclusion** [1] - 19:15
**excused** [1] - 78:7
**exercise** [1] - 21:25
**exhibit** [4] - 24:22,
  24:23, 33:17, 43:7
**Exhibit** [55] - 32:20,
  32:25, 33:10, 33:16,
  40:8, 40:11, 40:13,
  40:20, 40:24, 40:25,
  41:14, 42:6, 42:8,
  42:10, 42:17, 42:21,
  42:22, 43:4, 43:10,
  43:19, 43:22, 43:24,
  44:5, 44:10, 52:4,
  52:6, 52:8, 52:16,
  52:21, 53:5, 53:8,
  53:10, 54:2, 54:7,
  65:24, 66:5, 66:6,
  73:15, 73:16, 73:25,
  74:1, 74:6, 74:11,
  74:15, 74:17, 75:10,
  79:6, 79:6, 79:7,
  79:7, 79:8, 79:8,
  79:9, 79:9, 79:10
**Exhibits** [2] - 72:22,
  73:23
**exhibits** [1] - 24:22
**EXHIBITS** [1] - 79:5
**existed** [1] - 29:16
**exited** [1] - 70:4
**expect** [1] - 78:17
**experience** [3] -
  39:12, 39:21, 63:22
**expire** [1] - 8:23
**explain** [3] - 2:23,
  36:9, 36:10
**explained** [3] - 19:17,
  36:13, 40:1
**expressly** [1] - 11:16
**extended** [5] - 2:24,
  3:21, 7:13, 9:19,
  9:21
**extent** [1] - 7:1
**extra** [4] - 24:23,
  24:24, 33:20, 33:21

**extrinsic** [2] - 19:19, 19:23

## F

**facing** [4] - 2:25, 3:4, 8:6, 38:11
**fact** [8] - 9:13, 11:19, 15:23, 18:2, 22:6, 22:7, 67:13, 75:7
**factor** [1] - 67:16
**factors** [2] - 7:19, 68:14
**facts** [3] - 12:18, 16:4, 21:20
**factual** [1] - 17:6
**factually** [1] - 16:22
**fair** [10] - 33:4, 40:16, 42:13, 44:2, 52:13, 53:21, 53:23, 69:13, 73:6, 73:12
**fall** [1] - 16:2
**far** [9] - 8:10, 8:11, 29:24, 31:11, 36:4, 46:2, 46:22, 57:16, 77:13
**favor** [1] - 13:9
**FCRR** [3] - 1:21, 79:17, 79:24
**February** [1] - 23:25
**federal** [1] - 27:1
**Federal** [3] - 18:23, 19:2, 24:1
**feet** [1] - 31:13
**felony** [4] - 4:2, 5:6, 6:9, 18:21
**field** [1] - 18:13
**fifty** [1] - 48:21
**figure** [1] - 17:9
**file** [3] - 4:16, 4:19, 4:21
**filed** [4] - 4:13, 4:15, 10:12, 15:1
**final** [2] - 52:25, 53:21
**finally** [1] - 27:15
**finder** [1] - 75:6
**findings** [2] - 16:16, 62:3
**fine** [6] - 4:3, 4:4, 5:2, 5:8, 5:12, 64:20
**fined** [1] - 5:2
**firearm** [20] - 3:11, 6:8, 14:3, 15:9, 16:3, 16:10, 16:24, 17:1, 17:2, 18:21, 21:22, 22:1, 22:2, 22:5, 23:6, 23:8, 23:21, 72:14, 72:16
**firearms** [6] - 6:6,

6:17, 6:20, 21:25, 66:14, 76:21
**firm** [1] - 37:4
**firmly** [1] - 20:10
**first** [13] - 4:24, 19:8, 22:1, 24:15, 25:4, 29:24, 56:8, 56:21, 60:4, 60:14, 60:18, 70:12, 77:14
**five** [4] - 26:14, 48:21, 49:10, 76:23
**five-foot-ten** [1] - 48:21
**flashlight** [8] - 34:3, 34:6, 34:7, 34:9, 36:18, 37:25, 38:4, 75:18
**fled** [2] - 49:9, 50:12
**fleeing** [4] - 48:12, 48:16, 49:20, 72:6
**flight** [1] - 71:21
**floor** [2] - 22:3, 51:21
**focus** [2] - 26:17, 45:22
**focuses** [1] - 20:17
**folded** [1] - 55:2
**follow** [1] - 13:21
**followed** [1] - 20:9
**following** [3] - 4:8, 6:11, 8:11
**follows** [1] - 4:11
**foot** [4] - 28:13, 48:13, 48:21, 72:6
**FOR** [3] - 1:1, 1:12, 1:17
**foregoing** [1] - 79:18
**form** [1] - 17:20
**forth** [7] - 3:1, 4:7, 4:11, 4:20, 12:18, 12:22, 13:23
**forward** [4] - 2:7, 9:22, 15:21, 24:11
**four** [1] - 5:15
**frame** [1] - 35:6
**framed** [1] - 19:8
**frankly** [1] - 4:19
**free** [1] - 7:25
**friend** [1] - 18:7
**friend's** [1] - 18:8
**front** [26] - 28:5, 28:9, 34:18, 35:6, 40:14, 44:19, 45:18, 46:5, 46:16, 46:18, 47:24, 48:1, 50:19, 56:24, 57:7, 57:10, 69:7, 70:5, 70:15, 71:17, 71:24, 71:25, 74:18, 74:20, 77:11, 77:16
**frontier** [1] - 34:19
**fruition** [1] - 8:9

**Frye** [1] - 2:22
**full** [2] - 28:4, 79:19
**fully** [1] - 15:15

## G

**general** [1] - 41:10
**generally** [2] - 19:18
**George's** [3] - 15:24, 17:21, 21:5
**Giglio** [1] - 24:19
**girlfriend** [1] - 40:2
**given** [7] - 3:1, 15:23, 16:11, 23:15, 50:13, 61:17, 62:20
**glare** [4] - 32:7, 32:8, 32:10
**global** [4] - 3:22, 6:24, 7:1, 7:8
**Glock** [4] - 18:15, 21:10, 21:13, 51:19
**Government** [33] - 2:23, 3:21, 4:18, 4:21, 5:24, 6:22, 7:12, 7:23, 11:10, 12:21, 13:9, 13:14, 14:18, 14:20, 15:3, 15:16, 16:18, 17:18, 21:7, 21:20, 23:4, 24:15, 25:1, 25:4, 25:6, 32:20, 33:10, 42:16, 42:20, 42:22, 73:17, 74:17, 78:11
**GOVERNMENT** [3] - 1:12, 79:2, 79:5
**Government's** [61] - 10:2, 10:5, 10:11, 11:4, 11:5, 11:9, 11:22, 12:2, 13:9, 14:12, 15:2, 17:22, 24:2, 24:21, 24:23, 32:20, 32:25, 33:10, 33:16, 40:8, 40:11, 40:13, 40:20, 40:23, 40:25, 41:13, 42:5, 42:8, 42:10, 42:17, 43:4, 43:10, 43:19, 43:22, 43:24, 44:5, 44:10, 52:4, 52:6, 52:8, 52:16, 52:21, 53:5, 53:8, 53:10, 54:2, 54:7, 65:24, 66:5, 66:6, 72:22, 73:15, 73:16, 73:23, 73:25, 74:1, 74:5, 74:11, 74:15, 75:10, 75:16
**grams** [2] - 18:12, 22:22

**grant** [6] - 11:5, 11:9, 11:22, 13:15, 14:12, 14:18
**granted** [2] - 12:2, 24:3
**granting** [1] - 16:18
**gravamen** [1] - 15:12
**great** [1] - 33:23
**grinder** [2] - 51:23, 52:9
**group** [2] - 6:16, 10:22
**grouping** [1] - 6:16
**guideline** [3] - 6:13, 7:21, 8:9
**guidelines** [3] - 6:4, 6:19, 7:24
**guilty** [4] - 18:19, 22:20, 23:8, 23:25
**gun** [3] - 6:6, 14:2, 22:3
**guns** [1] - 23:13

## H

**half** [1] - 64:23
**half-smoked** [1] - 64:23
**hand** [6] - 29:12, 34:2, 34:4, 34:5, 38:3, 47:9
**handcuffed** [2] - 46:17, 46:18
**handed** [1] - 32:20
**handing** [3] - 42:5, 43:18, 53:4
**hands** [2] - 38:15, 47:7
**handwriting** [1] - 53:15
**hard** [2] - 39:2, 61:9
**headlights** [3] - 27:9, 30:3, 78:4
**hear** [5] - 3:7, 15:5, 69:9, 69:18, 69:20
**heard** [4] - 49:8, 50:5, 50:8, 76:19
**hearing** [16] - 2:21, 4:18, 7:15, 8:25, 9:12, 10:7, 10:14, 24:18, 33:14, 40:23, 42:20, 44:8, 52:19, 54:5, 73:19, 78:21
**HEARING** [1] - 1:9
**held** [2] - 8:25, 22:15
**hereby** [1] - 79:17
**high** [4] - 6:8, 16:11, 28:7, 28:10
**high-capacity** [1] - 6:8
**highlight** [2] - 12:20, 13:11

**himself** [1] - 2:12
**history** [1] - 5:25
**History** [2] - 6:1, 6:13
**hold** [1] - 39:22
**holding** [2] - 38:6, 74:22
**holster** [2] - 34:25, 35:2
**Honor** [45] - 2:9, 2:14, 3:9, 3:24, 6:5, 9:6, 9:25, 12:4, 14:25, 15:3, 15:13, 16:1, 16:22, 17:15, 24:13, 25:9, 32:17, 32:19, 33:9, 33:13, 33:18, 33:20, 35:25, 39:14, 39:17, 40:3, 40:19, 41:19, 42:16, 43:13, 44:4, 51:25, 52:15, 53:1, 53:20, 54:1, 54:14, 55:5, 66:2, 72:19, 73:8, 73:21, 74:2, 77:1, 77:3
**HONORABLE** [1] - 1:9
**hoping** [1] - 14:8
**hours** [5] - 9:15, 27:20, 27:23, 28:2, 28:12
**House** [4] - 26:10, 26:12, 26:18, 26:21
**Houston** [1] - 5:22
**HOWELL** [1] - 1:9
**Huddleston** [2] - 19:16, 21:1
**hundred** [1] - 48:21
**hundreds** [2] - 27:10, 27:18

## I

**idea** [1] - 75:7
**identification** [6] - 36:1, 38:23, 40:8, 43:19, 52:4, 53:5
**identified** [1] - 50:11
**identify** [4] - 2:7, 35:22, 36:10, 73:5
**identity** [1] - 19:5
**III** [2] - 6:1, 6:13
**illuminate** [1] - 34:8, 36:19
**illuminated** [4] - 36:14, 75:13, 75:17, 75:19
**illuminating** [1] - 38:3
**immediate** [2] - 37:15, 50:17
**immediately** [3] - 22:5, 58:20, 58:24

impermissible [1] -
   21:17
implications [1] -
   14:16
important [4] - 8:2,
   12:20, 13:8, 16:23
importantly [1] - 12:25
imprisoned [1] - 4:3
imprisonment [2] -
   3:13, 5:1
in-court [1] - 36:1
inappropriate [1] -
   16:15
inches [2] - 28:7, 28:9
incident [5] - 17:23,
   17:24, 23:19, 53:18,
   67:9
incidents [1] - 23:15
including [1] - 18:12
inclusion [1] - 19:15
incredibly [1] - 16:16
indeed [1] - 9:15
INDEX [1] - 79:1
indicated [2] - 72:5,
   76:22
indicates [1] - 22:4
indicia [1] - 11:14
Indictment [2] - 3:10,
   7:14
individual [12] - 35:21,
   48:12, 48:14, 48:15,
   49:13, 50:4, 50:16,
   51:9, 70:9, 72:6,
   72:7, 76:22
individual's [1] - 16:7
individuals [6] -
   34:12, 45:10, 68:19,
   69:12, 70:2, 70:19
indulgence [2] - 3:25,
   64:17
infer [2] - 22:7, 22:8
inferences [1] - 20:2
inform [1] - 9:14
information [33] -
   9:18, 15:7, 15:12,
   15:14, 15:16, 15:22,
   15:23, 17:10, 49:8,
   49:14, 49:18, 50:2,
   50:6, 50:8, 61:14,
   61:15, 61:17, 61:20,
   61:25, 62:3, 62:7,
   62:9, 62:12, 62:14,
   62:18, 62:19, 62:20,
   64:5, 68:6, 68:7,
   76:13, 76:16
Infraction [4] - 53:11,
   53:14, 53:16, 53:24
infractions [1] - 39:22
inherent [1] - 12:25
initial [8] - 8:18, 9:10,

36:9, 46:24, 48:4,
   50:22, 50:24, 55:8
initiated [1] - 58:22
inside [4] - 22:22,
   38:16, 40:16, 44:17
instance [2] - 13:5,
   61:22
instant [4] - 10:4,
   14:1, 18:3, 18:17
instead [1] - 20:16
instructed [1] - 9:13
instruction [5] -
   12:13, 13:13, 13:14,
   14:13, 24:3
instructions [2] -
   13:16, 13:21
insufficient [1] - 13:2
insurance [7] - 38:25,
   39:4, 39:5, 39:7,
   39:9, 39:13, 39:22
intend [1] - 4:18
intended [1] - 15:14
intent [15] - 5:18,
   13:25, 16:17, 18:20,
   19:4, 20:24, 21:9,
   22:4, 22:6, 22:11,
   22:12, 22:18, 22:21,
   22:24, 23:5
intention [1] - 11:6
interior [5] - 34:8,
   42:11, 72:24, 74:17,
   74:23
intermediate [2] -
   22:6, 22:7
intersection [1] -
   29:18
introduce [5] - 10:3,
   17:18, 25:13, 73:2,
   73:18
introduces [2] - 2:12,
   13:15
introduction [1] -
   19:19
involve [1] - 6:16
involved [4] - 27:4,
   27:8, 46:20, 49:1
involves [1] - 19:25
ironies [1] - 16:13
issue [5] - 16:25,
   19:21, 19:24, 19:25,
   36:24
issued [2] - 53:11,
   53:14
item [1] - 44:2
items [1] - 18:12
itself [4] - 16:15, 17:6,
   19:9, 61:18

## J

January [1] - 79:23
Jencks [2] - 24:16
JUDGE [1] - 1:10
judicial [1] - 11:18
juries [2] - 13:19,
   13:20
jurisdiction [2] -
   26:22, 26:24
jury [8] - 13:17, 15:22,
   15:23, 16:6, 16:11,
   16:16, 17:7, 22:7

## K

KARLA [1] - 1:12
Karla [2] - 1:15, 2:10
Karla-Dee [1] - 2:10
KARLA-DEE [1] - 1:12
Karla-Dee.Clark@
   usdoj.gov [1] - 1:15
keep [3] - 11:7, 22:4,
   25:20
kind [2] - 15:20, 16:14
King [1] - 20:25
knowing [2] - 14:3,
   14:9
knowledge [15] -
   12:23, 13:22, 14:5,
   15:5, 16:17, 19:5,
   19:22, 20:24, 21:8,
   21:13, 22:18, 22:24,
   23:21, 39:12, 39:21
knows [3] - 9:9, 14:5,
   14:6
Kutz [1] - 50:7

## L

lack [1] - 19:5
lane [2] - 31:2, 59:8
lanes [3] - 56:13,
   56:14, 56:15
large [2] - 50:18
last [3] - 8:25, 25:14,
   25:15
late [1] - 28:1
law [10] - 4:16, 13:3,
   20:11, 27:1, 27:3,
   27:7, 27:11, 27:15,
   48:23, 76:2
learn [1] - 31:20, 50:2,
   51:14
least [2] - 3:5, 66:21
leave [1] - 18:10
led [5] - 10:4, 66:20,
   67:24, 68:7, 68:11

left [7] - 9:16, 34:5,
   71:17, 72:12, 74:13,
   76:18
legal [1] - 21:3
lends [2] - 16:15, 17:6
length [2] - 36:6,
   71:11
lengthy [1] - 78:18
less [2] - 5:10, 23:6
letters [2] - 28:7, 28:9
level [4] - 6:6, 6:10,
   6:12, 7:21
Level [1] - 7:20
levels [1] - 7:17
license [7] - 31:20,
   32:11, 38:24, 39:2,
   44:15, 44:21, 61:10
light [2] - 77:9, 77:10
lighting [7] - 29:14,
   29:16, 31:8, 31:10,
   34:7, 57:23, 77:24
lights [21] - 28:17,
   29:18, 29:23, 36:14,
   36:20, 36:21, 36:24,
   53:12, 55:22, 57:12,
   57:14, 58:3, 58:7,
   58:11, 58:17, 58:20,
   58:22, 58:23, 60:14,
   66:20, 77:15
likelihood [1] - 16:10
likely [3] - 16:1, 16:2,
   23:6
likewise [1] - 19:16
limited [3] - 12:11,
   13:10, 14:17
limiting [5] - 12:13,
   13:12, 13:14, 14:13,
   24:3
list [2] - 24:22, 24:23
loaded [2] - 49:11,
   76:24
located [5] - 49:22,
   76:5, 76:9, 76:15,
   76:17
location [11] - 18:8,
   35:10, 35:22, 50:9,
   51:1, 62:2, 74:13,
   76:8, 76:11, 76:18,
   76:20
look [14] - 31:23, 32:4,
   32:23, 32:24, 35:20,
   40:9, 40:10, 42:6,
   42:7, 43:20, 43:21,
   52:5, 53:6, 53:7
looked [3] - 42:14,
   73:13
looking [3] - 15:21,
   62:19, 76:18
lookout [1] - 50:4
Loth [2] - 1:21, 79:24

LOTH [1] - 79:17
low [1] - 7:24

## M

ma'am [35] - 8:14,
   25:17, 25:19, 27:2,
   29:11, 32:3, 33:1,
   33:5, 34:15, 35:19,
   40:12, 40:18, 41:5,
   42:9, 42:15, 43:3,
   44:3, 46:13, 47:21,
   48:17, 48:19, 49:4,
   49:6, 49:15, 49:24,
   50:25, 52:7, 52:14,
   53:9, 53:19, 53:25,
   54:9, 64:20, 67:18,
   78:8
machine [1] - 1:24
magazine [7] - 6:8,
   18:17, 21:14, 49:12,
   51:18, 51:19, 76:24
Main [1] - 50:1
male [1] - 48:21
mandatory [2] - 5:6,
   5:11
manner [1] - 14:14
MANUEL [1] - 1:5
Manuel [2] - 2:3, 2:5
map [5] - 74:25, 75:1,
   75:11, 75:13, 75:17
March [9] - 13:25,
   17:20, 17:25, 21:5,
   21:12, 21:21, 23:9,
   23:19, 23:24
marijuana [62] - 5:19,
   5:21, 14:5, 14:6,
   14:7, 18:5, 18:8,
   18:13, 18:20, 21:22,
   22:14, 22:21, 22:22,
   22:24, 23:1, 23:22,
   27:13, 27:17, 37:8,
   37:11, 37:14, 37:21,
   37:22, 38:8, 38:9,
   38:13, 41:25, 43:25,
   44:17, 45:1, 51:21,
   51:23, 52:9, 63:7,
   63:9, 63:12, 63:13,
   63:16, 63:20, 63:22,
   63:23, 63:25, 64:2,
   64:7, 64:10, 64:22,
   65:18, 65:21, 66:14,
   66:16, 66:18, 67:14,
   67:21, 67:23, 68:3,
   68:8, 68:10, 68:11,
   68:13
marked [9] - 26:20,
   28:14, 28:15, 40:8,
   52:3, 55:19, 55:21,
   72:7, 72:8

**marker** [2] - 41:9, 42:24
**markings** [4] - 28:4, 28:6, 28:16
**Maryland** [16] - 5:21, 5:23, 6:3, 6:23, 6:25, 7:6, 8:5, 8:6, 10:14, 12:19, 17:21, 18:22, 22:1, 33:8, 39:2, 61:9
**mat** [2] - 22:3, 51:21
**matched** [1] - 50:4
**materially** [1] - 23:20
**matter** [2] - 2:3, 2:4
**matters** [1] - 24:13
**McDaniel** [52] - 1:17, 2:12, 2:14, 2:15, 2:18, 9:4, 9:6, 10:15, 12:1, 14:19, 14:24, 14:25, 16:14, 16:20, 17:12, 33:13, 38:18, 39:14, 39:16, 40:22, 41:17, 42:19, 43:10, 43:11, 44:7, 52:18, 54:4, 55:12, 64:17, 64:21, 65:10, 65:13, 66:2, 66:4, 67:12, 67:19, 72:19, 72:21, 73:7, 73:8, 73:11, 73:15, 73:20, 73:24, 74:2, 74:5, 74:12, 75:2, 75:5, 75:8, 75:9, 76:25
**mean** [3] - 28:15, 46:6, 60:9
**means** [1] - 20:1
**medium** [1] - 63:11
**member** [2] - 26:14, 26:15
**mental** [1] - 20:1
**mentioned** [1] - 54:18
**mere** [2] - 16:3, 67:11
**Michael** [1] - 45:5
**middle** [1] - 74:22
**might** [3] - 16:22, 19:19, 64:23
**Miller** [2] - 20:11, 78:22
**mind** [3] - 9:14, 20:1, 73:20
**minimal** [1] - 14:21
**minimum** [5] - 5:2, 5:7, 5:8, 5:11, 5:12
**minute** [2] - 70:22, 78:16
**minutes** [2] - 49:10, 76:23
**misdemeanor** [1] - 5:6
**Missouri** [1] - 2:22
**mistake** [2] - 19:5,

21:9
**mistakenly** [1] - 23:7
**misuse** [2] - 15:22, 16:11
**moderate** [2] - 37:17, 63:13
**modified** [1] - 8:21
**monitor** [2] - 32:7, 32:8
**months** [5] - 6:14, 7:22, 26:7
**morning** [13] - 27:20, 28:2, 28:12, 28:18, 29:6, 29:9, 33:7, 34:20, 35:22, 40:17, 42:14, 77:23, 78:4
**most** [1] - 13:8
**MOTION** [1] - 1:9
**motion** [23] - 10:3, 10:5, 10:8, 10:11, 10:12, 11:5, 11:9, 11:22, 12:2, 12:19, 13:9, 13:16, 13:23, 14:12, 14:19, 15:1, 16:18, 24:2, 24:8, 24:11, 56:22, 56:23
**motions** [2] - 4:18, 24:18
**motive** [9] - 12:24, 13:22, 13:24, 15:6, 16:17, 19:4, 19:22, 21:9, 22:8
**move** [7] - 4:22, 33:10, 40:19, 42:16, 44:4, 52:15, 54:2
**movement** [1] - 70:17
**movements** [1] - 38:3
**moving** [2] - 15:10, 38:15
**MR** [39] - 2:14, 9:6, 14:25, 16:20, 17:12, 33:13, 38:18, 39:14, 39:16, 40:22, 41:17, 42:19, 43:11, 44:7, 52:18, 54:4, 55:12, 64:17, 64:21, 65:10, 65:13, 66:2, 66:4, 67:12, 67:19, 72:19, 72:21, 73:8, 73:11, 73:15, 73:20, 73:24, 74:2, 74:5, 74:12, 75:5, 75:8, 75:9, 76:25
**MS** [85] - 2:9, 3:9, 3:24, 4:15, 5:15, 7:1, 7:5, 7:21, 8:14, 8:16, 8:24, 10:10, 12:4, 12:6, 12:9, 12:14, 17:15, 24:12, 24:15, 25:4, 25:9, 25:12,

28:24, 28:25, 29:3, 29:5, 32:5, 32:7, 32:12, 32:14, 32:16, 32:19, 32:22, 33:9, 33:17, 33:20, 33:24, 33:25, 35:25, 36:3, 38:20, 39:19, 40:3, 40:6, 40:19, 41:1, 41:6, 41:8, 41:12, 41:18, 41:21, 42:1, 42:4, 42:16, 42:23, 43:6, 43:9, 43:12, 43:15, 43:17, 44:4, 44:11, 44:14, 46:15, 51:24, 52:2, 52:15, 52:22, 52:25, 53:3, 53:20, 53:22, 54:1, 54:14, 54:17, 55:4, 65:9, 73:4, 74:3, 74:9, 77:3, 77:5, 78:6, 78:11, 78:17
**multiple** [3] - 47:19, 48:25, 71:22
**must** [2] - 20:4, 20:5

**N**

**name** [7] - 25:14, 25:15, 28:23, 29:1, 44:20, 45:5, 62:22
**narcotic** [2] - 5:5, 5:10
**narrow** [1] - 11:7
**natural** [1] - 29:14
**nature** [3] - 15:17, 23:9, 28:8
**necessarily** [1] - 16:9
**needed** [3] - 11:12, 30:9, 51:9
**negative** [1] - 14:15
**negotiations** [2] - 4:20, 9:8
**never** [4] - 13:4, 68:16
**next** [4] - 45:14, 47:25, 78:10, 78:17
**night** [1] - 28:1
**nine** [1] - 51:18
**nobody** [2] - 37:20, 67:9
**none** [1] - 65:2
**north** [3] - 30:16, 31:5, 56:25
**northbound** [6] - 29:13, 56:14, 56:16, 57:3, 57:13, 77:20
**Northwest** [5] - 29:13, 29:17, 29:21, 29:23, 56:11
**notably** [1] - 20:21
**note** [2] - 16:23, 60:18

**notes** [1] - 79:19
**nothing** [1] - 65:1
**notice** [1] - 39:22
**Notice** [4] - 53:11, 53:13, 53:15, 53:23
**notwithstanding** [3] - 6:3, 8:6, 20:7
**November** [1] - 1:6
**number** [1] - 32:11
**NW** [2] - 1:14, 1:17

**O**

**oath** [9] - 10:17, 10:20, 10:23, 10:25, 11:9, 11:16, 11:20, 11:23, 14:22
**objection** [27] - 21:19, 33:12, 33:13, 33:14, 38:18, 39:14, 39:16, 40:21, 40:22, 40:23, 42:18, 42:19, 42:20, 44:6, 44:7, 44:8, 52:17, 52:18, 52:19, 54:3, 54:4, 54:5, 65:9, 73:18, 74:7, 74:9
**objects** [2] - 12:3, 21:16
**observe** [3] - 29:20, 35:12, 57:14
**observed** [1] - 34:11
**observing** [1] - 71:5
**obstructed** [1] - 77:19
**obstructions** [1] - 77:22
**obtain** [2] - 10:14, 41:4
**obtained** [2] - 44:15
**obtaining** [1] - 10:13
**occasion** [4] - 19:1, 22:1, 62:25, 63:12
**occasions** [1] - 21:24
**occupants** [5] - 34:11, 44:25, 63:7, 66:21, 66:22
**occurred** [4] - 10:18, 50:24, 51:7, 53:18
**occurring** [2] - 17:23, 45:20
**October** [4] - 7:12, 8:13, 9:5, 24:17
**odor** [8] - 18:5, 27:12, 37:11, 37:14, 37:16, 37:17, 63:13, 68:11
**OF** [3] - 1:1, 1:3, 1:9
**offense** [11] - 5:5, 6:6, 6:9, 6:10, 6:12, 12:19, 13:25, 14:1,

21:21, 22:11, 22:13
**offenses** [2] - 5:10, 6:19
**offer** [13] - 3:5, 3:21, 6:22, 6:24, 7:2, 7:13, 8:20, 8:22, 8:24, 9:5, 9:21, 73:10, 74:5
**offered** [1] - 21:17
**offering** [1] - 15:7
**offers** [1] - 2:23
**office** [2] - 7:5, 9:16
**Office** [2] - 1:13, 7:8
**officer** [25] - 11:11, 11:18, 14:7, 14:8, 18:1, 18:4, 18:10, 18:11, 26:2, 27:1, 28:21, 42:5, 43:18, 45:5, 45:12, 51:12, 51:15, 52:3, 55:24, 56:3, 64:19, 76:2, 76:22, 78:7
**Officer** [28] - 25:5, 25:15, 27:19, 29:8, 32:23, 34:1, 35:20, 40:7, 41:2, 41:22, 42:24, 45:12, 45:17, 49:17, 51:17, 53:4, 54:18, 55:13, 64:11, 69:7, 69:8, 70:14, 73:5, 77:6
**officers** [12] - 22:22, 24:19, 44:23, 45:2, 45:9, 48:23, 50:14, 69:1, 69:2, 69:14, 69:16, 69:24
**official** [1] - 79:25
**Official** [1] - 1:22
**often** [2] - 20:23, 22:17
**OIS** [1] - 45:14
**ON** [1] - 1:9
**once** [3] - 14:21, 31:14, 50:10
**one** [22] - 2:11, 3:11, 3:13, 4:24, 5:2, 5:4, 6:24, 8:5, 10:10, 11:10, 16:13, 18:16, 19:11, 23:12, 23:13, 37:21, 51:17, 52:25, 53:21, 65:18, 70:16
**one-year** [1] - 8:5
**ongoing** [1] - 8:17
**open** [5] - 38:11, 71:14, 71:15, 71:17, 74:15
**opened** [1] - 76:2
**operated** [2] - 30:3, 78:4
**operating** [2] - 27:9, 68:7

**opinion** [1] - 13:17
**opponent** [1] - 11:17
**opportunity** [6] - 6:15, 19:4, 19:22, 31:23, 35:12, 51:11
**opposite** [3] - 56:19, 57:17, 59:22
**opposition** [1] - 15:1
**optional** [1] - 6:11
**options** [1] - 11:10
**orange** [1] - 35:24
**order** [3] - 15:4, 18:25, 58:16
**original** [5] - 11:5, 24:18, 53:23, 66:20, 69:6
**ostensibly** [1] - 17:3
**other-offense** [1] - 22:11
**outcome** [1] - 4:17
**outfit** [1] - 35:24
**outfitted** [2] - 65:4, 65:6
**outside** [3] - 16:8, 60:23, 77:23
**outweighs** [2] - 20:19, 23:10
**overall** [3] - 46:20, 67:17, 69:11
**overhighlight** [1] - 13:11
**overruled** [2] - 39:18, 65:12
**owner** [3] - 39:23, 62:15, 62:22
**ownership** [1] - 39:10

**P**

**p.m** [4] - 1:5, 18:1, 27:24, 56:6
**pack** [1] - 77:16
**panel** [1] - 44:20
**papers** [7] - 4:9, 4:13, 4:21, 4:22, 10:9, 17:14, 17:16
**paperwork** [2] - 8:4, 62:12
**pardon** [1] - 32:14
**Park** [6] - 49:1, 50:3, 50:15, 51:2, 54:19, 54:22
**park** [2] - 50:9, 50:16
**part** [6] - 4:22, 7:22, 8:2, 36:19, 54:9, 59:8
**particular** [3] - 13:8, 18:25, 45:23
**particularly** [1] - 23:15

**parties** [2] - 2:2, 24:4
**partner** [8] - 28:18, 28:20, 58:3, 59:18, 59:21, 59:23, 60:4, 68:24
**party** [1] - 11:17
**pass** [2] - 30:8, 59:23
**passed** [3] - 30:4, 57:11, 60:12
**passenger** [28] - 34:18, 34:19, 42:12, 44:20, 45:13, 45:16, 45:18, 45:24, 46:5, 46:19, 59:23, 67:4, 67:5, 68:20, 69:6, 69:8, 70:5, 70:12, 70:15, 70:20, 71:3, 71:16, 72:24, 74:18, 74:20
**passengers** [6] - 45:2, 46:4, 46:24, 69:16, 71:2, 71:18
**past** [1] - 60:15
**patrol** [6] - 26:19, 26:20, 28:12, 28:13, 44:19, 72:7
**penalties** [5] - 2:24, 3:3, 4:2, 4:6, 4:11
**pending** [2] - 5:22, 6:2
**people** [1] - 10:23
**perfectly** [1] - 16:19
**period** [1] - 8:5
**permanent** [1] - 26:14
**permission** [6] - 42:1, 43:6, 43:15, 44:11, 51:24, 52:22
**permissive** [2] - 15:11, 19:9
**person** [10] - 3:12, 14:3, 18:19, 18:21, 19:1, 35:17, 35:18, 35:22, 45:13, 49:9
**person's** [2] - 18:25, 19:12
**personnel** [1] - 48:25
**persons** [1] - 64:8
**Pettiford** [1] - 20:20
**PG** [1] - 18:1
**phone** [6] - 47:9, 47:12, 47:16, 47:17, 71:10, 71:22
**phones** [1] - 50:19
**photo** [2] - 33:21, 65:25
**photocopy** [1] - 33:22
**photograph** [3] - 33:2, 42:11, 43:25
**photographs** [1] - 73:3
**photos** [5] - 72:23,

75:20, 75:23, 76:3
**pick** [1] - 38:15
**picked** [4] - 37:22, 38:1, 38:9, 66:10
**picture** [7] - 32:1, 33:4, 40:16, 42:13, 44:2, 52:13, 74:22
**pistol** [3] - 18:15, 21:11, 21:14
**pitch** [2] - 77:23, 77:24
**placed** [8] - 10:20, 10:23, 10:25, 11:16, 42:25, 66:9, 67:5, 78:22
**placement** [1] - 22:3
**placing** [1] - 14:2
**plan** [7] - 7:16, 12:24, 13:10, 13:22, 19:4, 21:9
**plate** [1] - 32:11
**plea** [25] - 2:23, 3:2, 3:5, 3:21, 4:20, 4:23, 6:22, 6:24, 7:10, 7:13, 7:22, 8:10, 8:17, 8:20, 8:22, 8:24, 9:5, 9:8, 9:11, 9:18, 10:13, 10:18, 11:1, 11:20
**pleaded** [3] - 22:20, 23:8, 23:25
**pleadings** [1] - 12:23
**pled** [1] - 18:19
**pocket** [10] - 49:12, 50:19, 51:19, 55:8, 74:25, 75:1, 75:11, 75:13, 75:17, 76:24
**point** [11] - 36:18, 36:20, 37:21, 44:24, 45:17, 50:18, 62:7, 69:24, 71:11, 71:20, 76:5
**pointed** [1] - 19:7
**points** [3] - 6:1, 6:4, 6:10
**Police** [6] - 49:1, 50:3, 50:15, 51:2, 54:19, 54:22
**police** [17] - 18:1, 26:20, 28:4, 28:6, 28:8, 28:14, 28:16, 29:6, 31:11, 49:8, 50:9, 50:16, 54:19, 54:21, 55:21, 72:8
**position** [5] - 16:24, 17:4, 17:5, 21:24, 59:7
**positive** [1] - 18:13
**positively** [1] - 50:11
**possess** [2] - 14:3,

21:13
**possessed** [4] - 20:23, 21:22, 22:16, 23:7
**possession** [23] - 3:11, 3:16, 3:19, 4:2, 4:6, 4:10, 5:18, 5:20, 5:21, 6:18, 16:10, 18:20, 18:21, 20:22, 21:10, 22:9, 22:13, 22:16, 22:21, 22:23, 23:1, 23:5, 23:21
**possibility** [1] - 8:10
**possible** [3] - 11:7, 70:11, 70:12
**possibly** [2] - 15:6, 49:20
**posture** [1] - 9:7
**potential** [2] - 12:17, 23:11
**potentially** [2] - 6:16, 15:22
**pounds** [1] - 48:21
**powerful** [1] - 20:16
**prejudice** [6] - 12:17, 13:1, 20:6, 20:10, 20:17, 23:14
**prejudicial** [7] - 13:1, 15:15, 15:19, 20:16, 23:2, 23:3, 23:10
**preliminary** [1] - 24:12
**premarked** [2] - 43:18, 53:4
**preparation** [1] - 11:4
**prepare** [1] - 13:12
**prepared** [1] - 25:2
**present** [2] - 2:16, 75:20, 75:25
**presentation** [1] - 11:4
**presented** [1] - 24:5
**presumed** [1] - 13:20
**presuming** [1] - 61:20
**pretrial** [1] - 2:22
**primarily** [1] - 15:15
**Prince** [3] - 15:24, 17:21, 21:5
**priors** [1] - 5:13
**probable** [2] - 44:25, 68:12
**probative** [8] - 15:19, 16:16, 20:19, 21:12, 22:12, 23:5, 23:9, 23:20
**probity** [1] - 20:10
**problems** [1] - 78:3
**procedural** [2] - 9:7, 14:13
**procedure** [1] - 30:22
**proceed** [5] - 2:20, 10:6, 25:2, 25:3, 25:9

21:13
**proceeded** [4] - 29:12, 30:4, 48:13, 72:6
**Proceedings** [1] - 1:24
**proceedings** [2] - 11:15, 79:20
**process** [2] - 10:13, 54:9
**produced** [1] - 1:25
**proffer** [1] - 17:22
**proffering** [1] - 15:4
**prohibited** [1] - 16:5
**prohibiting** [1] - 19:9
**prohibits** [1] - 19:18
**prong** [1] - 12:17
**proof** [6] - 21:8, 38:25, 39:4, 39:5, 39:6, 39:9
**propensity** [5] - 16:15, 17:6, 21:18, 23:18
**proper** [1] - 20:8
**propose** [1] - 12:13
**prosecutor** [2] - 8:4, 10:16
**prove** [2] - 18:24, 21:17
**provide** [9] - 18:7, 36:17, 39:1, 39:5, 39:6, 39:9, 48:15, 61:5, 61:8
**provided** [8] - 10:15, 24:15, 24:16, 24:20, 24:21, 39:2, 61:9, 62:11
**provides** [2] - 4:16, 65:16
**providing** [1] - 12:13
**proving** [2] - 19:4, 19:11
**provision** [3] - 4:5, 4:24, 5:9
**public** [1] - 36:23
**publish** [5] - 33:21, 41:18, 43:12, 44:11, 52:22, 54:14
**publishing** [1] - 43:9
**pulled** [3] - 31:2, 58:24, 59:10
**punishable** [1] - 3:12
**purpose** [3] - 19:3, 19:11, 20:9
**purposes** [1] - 73:18
**pursuant** [1] - 8:9
**pursue** [3] - 11:24, 48:13, 72:7
**put** [19] - 3:10, 11:11, 24:10, 38:10, 41:25, 47:12, 47:15, 47:17, 48:12, 49:11, 49:13, 50:3, 61:20, 66:11, 71:10, 71:22, 73:6,

75:3, 76:16

## Q

**quadrant** [2] - 29:18, 31:10
**quarter** [1] - 44:20
**questioned** [1] - 39:11
**questions** [4] - 55:4, 73:21, 77:1, 78:6
**quick** [1] - 70:16
**quite** [4] - 4:19, 19:9, 20:24, 22:17
**quote** [1] - 22:11

## R

**radio** [14] - 30:19, 41:25, 48:12, 49:9, 49:11, 49:14, 50:3, 51:22, 61:23, 66:12, 72:5, 76:13, 76:20, 76:22
**raise** [1] - 23:14
**ran** [1] - 62:18
**range** [3] - 6:13, 7:22, 8:9
**rank** [1] - 26:1
**rather** [2] - 19:15, 23:19
**reach** [3] - 14:2, 22:5, 24:5
**reached** [1] - 36:7
**read** [5] - 10:19, 10:24, 11:12, 12:23, 13:14
**ready** [2] - 3:6, 17:17
**realized** [1] - 14:21
**really** [3] - 6:20, 23:3, 65:10
**rear** [17] - 28:5, 28:7, 33:8, 34:19, 35:7, 45:12, 45:15, 46:4, 46:16, 46:17, 46:19, 46:25, 69:6, 70:12, 70:25, 71:17
**rear-seat** [2] - 45:15, 46:19
**reason** [7] - 6:1, 17:7, 36:10, 36:11, 36:23, 45:23, 67:20
**reasons** [5] - 4:8, 12:20, 12:24, 16:17, 23:23
**receive** [2] - 62:8, 76:13
**received** [5] - 10:18, 33:15, 62:14, 63:5, 64:5

**recess** [1] - 78:20
**recitation** [1] - 9:7
**recognize** [10] - 32:1, 32:25, 35:17, 40:11, 42:8, 43:22, 49:13, 52:6, 53:8, 72:23
**recognized** [1] - 22:10
**recollection** [1] - 57:1
**record** [7] - 2:8, 3:10, 32:19, 35:25, 36:2, 41:13, 43:9
**recovered** [9] - 18:11, 18:18, 22:22, 50:21, 51:15, 51:17, 51:21, 52:9, 64:1
**recovery** [1] - 76:20
**redact** [1] - 11:6
**redirect** [1] - 77:2
**REDIRECT** [1] - 77:4
**reference** [1] - 15:6
**referred** [2] - 41:2, 41:10
**referring** [3] - 47:4, 47:5, 52:11
**reflect** [3] - 19:20, 35:25, 36:2
**reflective** [1] - 28:8
**regard** [3] - 20:24, 22:18, 22:25
**regarding** [7] - 9:14, 22:14, 23:5, 39:4, 39:5, 39:9, 54:20
**registered** [3] - 39:23, 62:15, 62:22
**registration** [7] - 38:24, 39:3, 44:16, 61:10, 62:12, 63:5, 65:17
**rejected** [2] - 8:24, 9:1
**rejection** [1] - 8:18
**related** [4] - 9:8, 9:18, 15:23, 23:20
**relates** [1] - 17:23
**relation** [1] - 45:9
**relayed** [1] - 10:16
**relevance** [2] - 20:7, 65:9
**relevant** [8] - 13:21, 19:21, 20:9, 20:24, 21:8, 21:12, 22:18, 22:24
**reliability** [1] - 11:14
**remainder** [1] - 78:21
**remember** [4] - 58:9, 58:11, 62:24, 69:4
**remote** [1] - 62:2
**remove** [2] - 44:24, 70:15
**removed** [9] - 45:12, 45:16, 45:18, 46:5,

46:7, 46:24, 69:7, 69:8, 70:13
**removing** [1] - 45:2
**replacement** [1] - 78:15
**replied** [1] - 18:7
**report** [2] - 11:1, 76:20
**reported** [2] - 1:24, 78:22
**reporter** [1] - 78:15
**Reporter** [3] - 1:21, 1:22, 79:25
**reports** [1] - 62:3
**representation** [1] - 9:10
**represented** [2] - 9:21, 11:13
**request** [6] - 13:12, 15:2, 47:14, 47:15, 66:21, 68:16
**requested** [6] - 30:19, 31:21, 44:20, 47:12, 51:8, 71:9
**requests** [1] - 71:22
**required** [1] - 12:16
**residue** [1] - 64:12
**respect** [2] - 7:11, 9:2
**respond** [1] - 51:8
**responded** [1] - 50:9
**response** [3] - 17:13, 36:16, 47:13
**responsibilities** [1] - 26:18
**responsibility** [3] - 7:18, 36:24, 69:11
**rest** [2] - 17:13, 17:15
**restrict** [1] - 7:23
**restrictively** [1] - 19:8
**resulted** [1] - 66:19
**rethought** [1] - 9:17
**retreated** [1] - 44:19
**retrieve** [2] - 33:17, 43:6
**return** [3] - 48:13, 51:1, 51:4
**returned** [2] - 45:22, 50:23
**review** [1] - 3:3
**reviewing** [1] - 8:4
**REYNOSO** [1] - 1:5
**Reynoso** [37] - 2:3, 2:6, 2:16, 2:19, 2:25, 3:2, 3:4, 5:13, 5:15, 9:5, 9:10, 9:13, 9:24, 15:8, 15:25, 65:16, 67:5, 67:22, 67:24, 68:8, 69:14, 69:25, 70:1, 70:4, 70:10, 70:21, 71:6, 71:7, 71:8, 71:12, 71:20,

72:1, 76:5, 76:8, 76:12, 76:19
**Reynoso's** [1] - 8:13
**right-hand** [1] - 29:12
**rolled** [2] - 38:11, 60:7
**rolled-up** [1] - 38:11
**rooted** [1] - 20:10
**rounds** [2] - 51:18, 51:20
**RPR** [3] - 1:21, 79:17, 79:24
**rule** [5] - 17:17, 19:9, 19:15, 20:15, 20:16
**Rule** [10] - 12:17, 18:23, 19:2, 19:8, 19:15, 20:5, 20:10, 20:15, 23:3, 24:1
**ruling** [1] - 12:7
**run** [7] - 31:21, 48:3, 48:11, 61:12, 61:13, 61:19, 61:23
**running** [6] - 29:23, 31:7, 36:24, 57:15, 61:14, 61:25
**runs** [1] - 62:2

## S

**safe** [3] - 59:9, 70:11
**safeguards** [1] - 14:13
**safety** [4] - 30:9, 36:23, 46:20, 69:11
**Saint** [2] - 1:21, 79:24
**SAINT** [1] - 79:17
**Saint-Loth** [1] - 1:21, 79:24
**SAINT-LOTH** [1] - 79:17
**sat** [1] - 45:13
**satisfy** [1] - 12:17
**saw** [14] - 29:24, 30:2, 32:1, 35:17, 38:5, 41:3, 47:10, 48:10, 56:8, 56:10, 56:21, 58:2, 64:1, 77:14
**scenario** [1] - 70:11
**scenarios** [1] - 17:6
**Scene** [5] - 26:4, 26:5, 26:8, 51:17, 75:24
**scene** [10] - 45:7, 51:4, 51:7, 51:8, 51:9, 51:10, 51:11, 69:2, 69:11, 71:5
**scheme** [2] - 16:8, 16:9
**scored** [1] - 6:4
**Scott** [3] - 25:5, 25:15, 79:3
**SCOTT** [1] - 25:6

**screen** [1] - 32:9
**search** [25] - 18:13, 45:1, 48:24, 49:2, 49:3, 49:18, 49:20, 50:17, 51:8, 51:12, 51:15, 54:21, 54:23, 54:25, 64:6, 67:1, 67:4, 67:9, 67:15, 67:18, 67:25, 68:12, 68:17, 76:14
**Search** [4] - 26:4, 26:6, 26:9, 51:17
**searched** [3] - 18:11, 18:17, 67:3
**searching** [1] - 49:7
**seat** [12] - 17:3, 18:2, 22:3, 34:17, 34:18, 34:19, 45:15, 45:21, 46:19, 67:5, 70:5, 70:13
**seated** [3] - 2:16, 34:14, 34:16
**second** [7] - 2:11, 22:2, 45:24, 46:3, 59:8, 70:5, 78:12
**secondary** [1] - 54:23
**Secret** [7] - 25:22, 25:23, 26:3, 28:10, 28:22, 45:4, 48:25
**Section** [3] - 3:14, 3:17, 4:9
**see** [32] - 10:21, 10:24, 12:6, 12:8, 12:10, 19:2, 19:6, 19:12, 20:7, 20:11, 20:20, 20:25, 21:2, 22:9, 22:19, 32:9, 32:13, 32:15, 35:21, 41:2, 42:25, 48:6, 57:11, 57:20, 57:25, 58:10, 60:14, 64:10, 65:24, 73:7, 74:21, 75:3
**seeing** [3] - 11:8, 58:6, 78:3
**seek** [1] - 24:6
**seeks** [4] - 17:18, 21:7, 21:20, 23:4
**semi** [3] - 18:15, 21:11, 21:14
**semi-automatic** [3] - 18:15, 21:11, 21:14
**sense** [1] - 7:8
**sentence** [5] - 5:1, 7:25, 8:8, 19:8
**sentencing** [5] - 5:23, 6:2, 7:7, 7:15, 18:22
**separate** [1] - 78:22
**separated** [1] - 77:17
**serious** [1] - 14:9
**serves** [1] - 22:6

**service** [2] - 34:20, 34:24
**Service** [6] - 25:22, 25:24, 26:3, 28:10, 45:4, 48:25
**set** [9] - 2:11, 4:7, 4:11, 12:18, 12:21, 13:23, 21:3, 66:11
**setting** [2] - 3:7, 10:22
**seven** [1] - 18:16
**several** [1] - 18:12
**shaded** [1] - 74:21
**shall** [2] - 5:2
**shift** [1] - 27:24
**short** [2] - 19:14, 78:18
**shorthand** [1] - 1:24
**shortly** [1] - 17:25
**show** [10] - 15:4, 15:7, 18:25, 21:12, 23:18, 40:7, 41:15, 52:3, 72:18, 73:1
**showed** [15] - 37:23, 38:2, 38:16, 41:23, 41:24, 43:1, 44:1, 44:16, 66:5, 66:7, 66:8, 66:17, 67:24, 68:10
**showing** [4] - 40:14, 73:25, 75:10, 75:16
**shown** [3] - 66:19, 67:22, 68:8
**sic** [2] - 6:17, 13:4
**side** [32] - 31:17, 31:18, 35:7, 35:8, 35:9, 35:15, 35:16, 37:6, 37:7, 37:14, 38:21, 40:14, 42:12, 44:20, 47:1, 47:2, 50:7, 51:20, 59:3, 59:6, 59:22, 59:23, 60:10, 68:20, 70:20, 70:25, 71:3, 71:9, 71:16, 71:25, 72:24, 74:18
**sides** [2] - 28:16, 56:13
**sidewalk** [2] - 59:22, 59:25
**significant** [1] - 76:16
**similar** [5] - 16:1, 16:14, 20:23, 22:3, 22:17
**similarities** [3] - 16:4, 16:11, 17:5
**similarity** [2] - 23:16, 23:18
**similarly** [1] - 22:14
**simple** [6] - 3:15, 3:18, 4:6, 4:9, 6:17

**simultaneously** [1] - 30:17
**single** [1] - 17:23
**sirens** [1] - 28:17
**sitting** [3] - 18:2, 35:24, 45:21
**situation** [1] - 10:22
**Sitzmann** [1] - 20:12
**six** [2] - 5:25, 28:7
**slight** [1] - 61:1
**slightly** [1] - 77:17
**slow** [3] - 46:3, 70:11, 70:17
**slower** [1] - 58:18
**smell** [7] - 14:6, 37:14, 63:11, 63:12, 63:19, 63:23, 67:23
**smelled** [4] - 18:4, 27:12, 63:16, 67:13
**Smith** [1] - 18:15
**smoked** [1] - 64:23
**smoking** [4] - 37:8, 37:20, 63:9, 65:18
**solicited** [1] - 15:16
**sometime** [1] - 58:21
**sometimes** [3] - 62:23, 64:22
**soon** [2] - 37:13, 57:13
**sorry** [5] - 28:24, 39:15, 39:16, 53:21, 55:18
**sort** [5] - 6:20, 8:18, 13:17, 13:24, 75:6
**southbound** [10] - 29:22, 48:4, 48:7, 56:15, 56:19, 57:3, 57:5, 57:18, 77:8, 77:18
**space** [1] - 59:9
**speaking** [1] - 8:4
**specifically** [1] - 17:25
**specify** [1] - 5:5
**speed** [2] - 58:16, 58:18
**spell** [3] - 25:14, 28:23, 29:1
**sprint** [3] - 48:2, 72:1, 72:2
**staff** [2] - 24:24, 78:13
**stand** [2] - 25:5, 78:11
**standard** [1] - 30:22
**standards** [1] - 21:3
**standing** [5] - 13:2, 46:25, 70:24, 70:25, 73:21
**standpoint** [1] - 30:9
**standstill** [1] - 56:22
**start** [6] - 3:9, 4:1, 10:5, 45:2, 48:10, 56:4

**started** [5] - 8:19, 47:23, 48:7, 61:12, 72:10
**starting** [2] - 27:24, 60:24
**state** [2] - 19:25, 20:1
**State's** [1] - 7:5
**statements** [1] - 11:18
**States** [11] - 2:3, 2:5, 2:10, 3:14, 3:17, 13:20, 25:22, 25:23, 45:4, 50:15, 54:19
**STATES** [3] - 1:1, 1:3, 1:10
**status** [1] - 8:25
**statute** [2] - 3:20, 4:10
**statutory** [3] - 4:2, 4:5, 4:6
**stayed** [1] - 72:4
**stemming** [3] - 17:19, 21:4, 23:9
**stenographic** [1] - 79:19
**step** [4] - 20:8, 46:6, 46:9, 69:25
**stepped** [6] - 45:25, 46:10, 47:1, 47:2, 71:8
**stepping** [1] - 61:18
**still** [3] - 6:4, 51:10, 70:23
**stipulation** [1] - 12:10
**stood** [1] - 72:4
**stop** [18] - 30:13, 30:14, 30:15, 30:25, 31:4, 31:11, 33:3, 35:10, 36:10, 36:12, 36:14, 36:23, 37:1, 45:7, 47:6, 50:24, 51:7, 66:20
**stopped** [8] - 31:5, 31:6, 31:9, 31:14, 33:7, 35:5, 35:6, 36:4
**stops** [2] - 27:4, 27:8
**Street** [19] - 1:14, 1:17, 29:13, 29:17, 29:21, 29:22, 30:7, 30:15, 31:3, 48:5, 49:5, 56:11, 56:25, 57:3, 57:14, 77:6, 77:8, 77:21
**street** [2] - 29:18, 31:2, 57:6, 59:5, 59:15, 77:24
**strong** [2] - 18:5, 37:16
**style** [1] - 7:7
**subject** [1] - 4:8
**submit** [3] - 13:6,

13:13, 33:22
**substance** [5] - 3:16, 3:19, 5:20, 55:3, 55:7
**substantially** [1] - 20:19
**substation** [2] - 51:4, 54:23
**Suite** [1] - 1:18
**sum** [1] - 50:18
**suppress** [2] - 10:4, 24:8
**SUPPRESS** [1] - 1:9
**Supreme** [5] - 13:20, 19:16, 19:17, 21:1
**surrounding** [2] - 9:9, 21:20
**Surveillance** [1] - 26:11
**surveillance** [1] - 26:13
**suspect** [2] - 49:20, 49:21
**sustained** [1] - 38:19
**sworn** [1] - 25:6
**system** [1] - 61:23

# T

**table** [1] - 2:17
**tactical** [1] - 35:11
**tag** [11] - 30:20, 31:7, 31:20, 31:22, 33:8, 61:12, 61:13, 61:14, 62:1, 62:9, 62:21
**tags** [2] - 61:22, 63:2
**tangible** [1] - 24:8
**tap** [1] - 60:6
**taught** [2] - 39:12, 39:21
**Technician** [1] - 75:24
**temporarily** [1] - 54:19
**temporary** [2] - 51:3, 54:11
**ten** [5] - 4:3, 8:6, 31:13, 48:21, 78:16
**ten-minute** [1] - 78:16
**term** [3] - 3:13, 5:1, 7:7
**terminated** [1] - 9:2
**termination** [1] - 36:25
**terms** [11] - 5:6, 7:4, 8:20, 11:14, 11:24, 13:24, 14:9, 14:13, 36:5, 38:22, 68:6
**test** [1] - 13:7
**tested** [3] - 18:13, 64:13, 64:15

**testified** [2] - 56:7, 63:15
**testimony** [4] - 63:6, 63:11, 65:17, 69:6
**Texas** [1] - 5:22
**THC** [3] - 18:13, 64:13, 64:15
**THE** [110] - 1:1, 1:9, 1:12, 1:17, 2:2, 2:13, 2:18, 3:23, 4:13, 5:13, 6:23, 7:3, 7:20, 8:12, 8:15, 8:22, 9:3, 9:23, 9:25, 10:1, 12:1, 12:5, 12:8, 12:12, 14:23, 16:13, 17:11, 17:13, 17:17, 24:14, 25:3, 25:7, 25:8, 25:10, 28:23, 29:4, 32:6, 32:9, 32:13, 32:15, 32:18, 33:12, 33:14, 33:19, 33:23, 36:2, 38:19, 39:15, 39:18, 40:5, 40:21, 40:23, 41:7, 41:16, 41:20, 42:3, 42:18, 42:20, 43:8, 43:14, 43:16, 44:6, 44:8, 44:13, 46:3, 46:9, 46:11, 46:13, 46:14, 52:1, 52:17, 52:19, 52:24, 53:2, 54:3, 54:5, 54:9, 54:10, 54:12, 54:13, 54:16, 55:6, 55:8, 55:10, 64:10, 64:12, 64:16, 64:18, 64:20, 65:12, 66:3, 67:13, 67:16, 72:20, 73:2, 73:5, 73:17, 73:22, 74:4, 74:7, 74:10, 75:2, 75:6, 77:2, 78:7, 78:8, 78:9, 78:12, 78:14, 78:19
**third** [1] - 5:8
**thousands** [3] - 27:6, 27:14, 63:16
**three** [9] - 4:7, 4:10, 5:11, 5:16, 5:17, 7:17, 26:14, 34:13, 56:14
**ties** [1] - 13:25
**tilt** [1] - 13:9
**Timothy** [1] - 78:22
**tinted** [1] - 31:25
**Title** [1] - 3:17
**title** [1] - 26:1
**TO** [1] - 1:9
**today** [1] - 15:5
**tone** [2] - 37:2, 37:4
**took** [5] - 48:2, 50:18,

72:1, 72:2, 75:23
**top** [1] - 55:22
**tour** [1] - 56:4
**toward** [4] - 31:24, 34:10, 38:6, 59:14
**towards** [3] - 38:10, 47:24, 71:24
**traffic** [22] - 27:4, 27:8, 30:10, 30:13, 30:14, 30:15, 30:25, 33:3, 36:10, 36:12, 36:14, 36:23, 37:1, 45:7, 47:6, 50:24, 51:7, 56:13, 56:14, 56:15, 66:19, 77:7
**train** [1] - 6:21
**TRANSCRIPT** [1] - 1:9
**transcript** [15] - 1:24, 10:13, 10:15, 10:18, 10:19, 10:24, 11:6, 11:8, 11:13, 11:21, 12:3, 12:11, 14:22, 79:19, 79:20
**transcription** [1] - 1:25
**trap** [1] - 16:2
**travel** [3] - 48:4, 58:19, 59:8
**traveling** [11] - 56:16, 56:18, 56:25, 57:3, 57:5, 57:9, 57:17, 58:2, 58:4, 58:11, 77:18
**trial** [8] - 4:16, 4:17, 6:9, 6:11, 8:11, 9:17, 9:22, 24:2
**true** [2] - 79:18, 79:19
**truth** [1] - 19:24
**trying** [1] - 16:6
**turn** [16] - 22:8, 24:7, 29:12, 30:5, 30:6, 30:7, 30:10, 30:11, 57:13, 57:16, 58:10, 58:14, 58:18, 58:21, 58:22, 58:23
**turned** [2] - 36:21, 77:6
**two** [20] - 5:7, 5:9, 6:4, 16:12, 17:6, 20:8, 23:15, 25:1, 28:9, 30:1, 48:21, 50:19, 51:10, 56:15, 57:19, 66:22, 68:14, 68:19, 69:16, 70:16
**two-step** [1] - 20:8
**type** [4] - 5:6, 11:24, 55:2, 74:22
**typically** [3] - 2:21, 62:20, 64:12

# U

**U-turn** [11] - 30:5, 30:6, 30:7, 30:10, 30:11, 58:10, 58:14, 58:18, 58:21, 58:22, 58:23
**U.S** [16] - 1:13, 7:8, 19:12, 20:7, 20:11, 20:12, 20:20, 20:25, 21:1, 21:2, 48:25, 49:1, 50:3, 51:2, 54:22, 55:1
**ultimately** [2] - 8:3, 11:3
**unable** [2] - 18:7, 24:4
**unburned** [3] - 63:20, 63:23, 64:1
**uncovered** [1] - 18:14
**under** [30] - 4:9, 4:11, 4:24, 6:5, 6:7, 7:19, 10:17, 10:20, 10:23, 10:25, 11:8, 11:16, 11:20, 11:23, 14:22, 15:19, 15:25, 16:19, 18:23, 20:3, 20:5, 20:9, 20:10, 20:14, 22:2, 23:3, 24:1, 67:6, 78:22
**underlying** [1] - 23:19
**underneath** [2] - 17:3, 51:20
**understood** [3] - 6:24, 68:14, 69:18
**unduly** [1] - 23:3
**unfair** [2] - 20:17, 21:18
**unfairly** [1] - 20:6
**uniform** [1] - 28:5
**uniforms** [1] - 28:4
**unique** [1] - 13:24
**Unit** [4] - 26:4, 26:6, 26:9, 26:11
**unit** [2] - 26:9, 26:13
**United** [11] - 2:3, 2:5, 2:10, 3:14, 3:17, 13:20, 25:22, 25:23, 45:4, 50:14, 54:19
**UNITED** [3] - 1:1, 1:3, 1:10
**unlawful** [4] - 3:11, 20:22, 22:16, 22:23
**unless** [1] - 19:20
**unmarked** [1] - 55:20
**up** [24] - 2:11, 3:8, 25:20, 31:19, 31:24, 32:24, 35:15, 37:22, 38:1, 38:10, 38:11, 38:15, 39:22, 40:10,

42:7, 43:21, 47:2, 53:7, 55:2, 58:16, 59:7, 66:10, 66:11, 71:9
**urged** [1] - 16:18
**utilized** [1] - 36:18

# V

**valid** [5] - 31:22, 39:6, 61:22, 62:21, 63:3
**value** [2] - 20:20, 22:12
**variance** [1] - 7:19
**vehicle** [158] - 14:10, 15:9, 15:25, 18:11, 27:9, 28:16, 29:7, 30:4, 30:13, 30:19, 30:20, 30:25, 31:2, 31:7, 31:12, 31:14, 31:16, 33:2, 33:4, 33:8, 34:8, 34:11, 34:23, 35:1, 35:6, 36:6, 37:9, 37:12, 37:21, 38:10, 39:3, 39:10, 39:11, 39:23, 39:25, 40:1, 40:15, 40:17, 42:11, 42:14, 44:25, 45:1, 45:3, 45:11, 45:13, 45:18, 45:25, 46:6, 46:7, 46:8, 46:10, 46:25, 47:1, 47:2, 47:4, 47:24, 48:2, 48:13, 49:12, 50:12, 52:10, 52:11, 52:12, 55:15, 55:19, 55:25, 56:8, 56:10, 56:18, 56:21, 56:23, 57:4, 57:8, 57:17, 57:20, 58:2, 58:7, 58:24, 59:2, 59:6, 59:7, 59:9, 59:13, 59:14, 59:15, 59:17, 59:19, 59:21, 59:22, 59:24, 60:3, 60:6, 60:12, 61:10, 61:11, 61:13, 61:16, 62:8, 62:15, 62:22, 63:7, 64:1, 64:6, 64:7, 64:8, 65:2, 65:3, 65:17, 66:12, 66:21, 66:22, 66:23, 67:1, 67:3, 67:4, 67:15, 67:18, 67:21, 67:25, 68:4, 68:12, 68:19, 68:20, 68:22, 68:25, 69:5, 69:10, 69:15, 69:17, 70:1, 70:3, 70:4, 70:10, 70:20, 70:23, 70:24,

71:1, 71:3, 71:6, 71:8, 71:16, 71:18, 71:24, 71:25, 72:9, 72:13, 74:19, 76:19, 77:13
**vehicles** [8] - 56:24, 57:5, 57:7, 57:9, 65:6, 77:11, 77:16, 77:17
**vehicular** [1] - 77:7
**versus** [3] - 2:3, 2:5, 23:12
**vest** [1] - 28:9
**view** [2] - 24:6, 77:19
**viewed** [1] - 40:17
**violation** [4] - 3:14, 3:16, 3:19, 66:19
**Virginia** [1] - 5:19
**virtue** [1] - 16:3
**visible** [1] - 22:5
**visiting** [1] - 18:7
**voice** [3] - 25:20, 37:2, 49:13
**voluntarily** [2] - 46:10, 46:21
**vs** [1] - 1:4

# W

**wad** [1] - 55:9
**wait** [2] - 12:6, 30:8
**waited** [1] - 30:4
**walk** [2] - 14:8, 47:23
**walked** [1] - 71:24
**walking** [6] - 31:19, 31:24, 34:10, 35:5, 59:5, 59:14
**wants** [1] - 14:18
**warm** [1] - 60:24
**warrant** [1] - 68:17
**Washington** [6] - 1:6, 1:14, 1:18, 1:22, 26:22, 26:25
**water** [1] - 64:19
**weapon** [3] - 34:20, 34:24, 35:2
**weapons** [1] - 50:17
**wearing** [1] - 48:22
**weighing** [1] - 20:9
**Wesson** [1] - 18:15
**westbound** [2] - 29:11, 48:8
**White** [4] - 26:10, 26:12, 26:18, 26:21
**white** [2] - 55:3, 55:6
**whole** [1] - 70:11
**window** [20] - 35:7, 35:15, 35:16, 36:8, 37:7, 37:14, 38:21,

60:7, 60:8, 60:9, 60:11, 60:13, 60:15, 60:17, 60:19, 61:6, 61:18
**windows** [1] - 31:25
**wished** [1] - 9:17
**wishes** [1] - 9:22
**withdraw** [1] - 4:22
**withdrew** [1] - 9:1
**witness** [13] - 25:6, 32:16, 32:20, 40:4, 41:6, 41:11, 41:14, 42:2, 43:5, 43:15, 51:25, 78:10, 78:17
**WITNESS** [11] - 25:8, 46:9, 46:13, 54:9, 54:12, 55:8, 64:12, 64:20, 67:16, 78:8, 79:2
**witness'** [2] - 32:8, 32:9
**witnessed** [1] - 66:16
**witnesses** [2] - 24:10, 25:2
**word** [1] - 28:8
**words** [1] - 16:25
**works** [1] - 61:23
**worn** [1] - 65:14
**wrapped** [4] - 37:22, 38:9, 43:25, 51:21
**write** [1] - 54:8

# Y

**year** [5] - 3:13, 5:2, 8:5, 15:25, 17:23
**years** [7] - 4:3, 5:7, 5:12, 8:6, 25:25, 26:14, 26:15
**yourself** [1] - 25:13
**yourselves** [1] - 2:8

# Z

**Zafiro** [1] - 13:19
**Zolton** [2] - 51:17, 75:24
**zone** [1] - 26:21